STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. CHRIS
SCHMID, DEFENDANT–APPELLANT.

Argued February 4, 1980—Decided November 25, 1980.

*Jerrold Kamensky* and *Sanford Levinson*, a member of the California Bar, argued the cause for appellant (*Jerrold Kamensky*, attorney).

*Florence V. Hughes*, Deputy Attorney General, argued the cause for respondent (*John J. Degnan*, Attorney General of New Jersey, attorney; *John DeCicco*, Deputy Attorney General, of counsel).

*Nicholas de B. Katzenbach* argued the cause for intervenor Princeton University (*Thomas H. Wright, Jr.*, attorney; *Laura C. Ford* of counsel and on the brief).

*Michael F. Spicer* and *Frances Goldmark* submitted a brief on behalf of *amicus curiae* Association of Independent Colleges and Universities in New Jersey (*Jamieson, McCardell, Moore, Peskin & Spicer*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

While distributing political literature on the campus of Princeton University, defendant Chris Schmid, a member of the United States Labor Party, was arrested and charged by the University with trespass upon private property. He was subsequently convicted under the State's penal trespass statute. On this appeal he challenges the conviction on the grounds that it stems from a violation of his federal and state constitutional rights to freedom of speech and assembly.

I

On April 5, 1978, Chris Schmid [1] was distributing and selling political materials on the main campus of Princeton University, a private, non-profit institution of higher education located in the Borough of Princeton, New Jersey. These materials dealt

---

[1] Another Labor Party member, Stephen Komm, was assisting Schmid in the on-campus distribution and sale of materials. Komm also was arrested for trespass, but the charges against him were dismissed in municipal court.

with the City of Newark mayoral campaign and with the United States Labor Party in general. Schmid was not a student at Princeton University nor was the Labor Party a university affiliated or campus-based organization. On certain previous occasions members of the Labor Party had unsuccessfully sought to obtain University permission to distribute and sell political materials on campus. On this particular occasion in April 1978, however, no such permission was either sought or received.

Under the University regulations then in effect, permission was a prerequisite for the on campus distribution of materials by off–campus organizations. No such permission was required, however, for the same activity by a university affiliated organization or by Princeton students. The regulatory language pertaining to off–campus organizations stated in part:

> Demonstrations and the distribution of leaflets, statements, or petitions . . . are permitted on the campus unless, or until, they disrupt regular essential operations of the University or significantly infringe on the rights of others. On the same grounds, the campus is open to speakers whom students, faculty, or staff wish to hear, and to recruiters for agencies and organizations in whom students or faculty have an interest. [University Regulations as passed by the Council of the Princeton University Community, May 1975, as amended 1976.]

These regulations further provided that no solicitation of either sales or charitable contributions was to be permitted on campus without the express authorization of the appropriate University officials. Moreover, door- to-door political or charitable solicitation was generally prohibited. *Ibid.* The University revised these regulations in 1979.[2]

---

[2]The revised regulations now read in pertinent part as follows:

REGULATIONS GOVERNING SOLICITATION (INCLUDING COMMER-CIAL SALES, FUNDRAISING, AND DISTRIBUTION OF LITERATURE) BY OFF–CAMPUS INDIVIDUALS OR ORGANIZATIONS

> No individual or organization may distribute literature, advertise, or otherwise solicit customers, seek donations, or make sales on campus without the express authorization of the Office of the Dean of Student Affairs.

COMMERCIAL SALES. The Office of the Dean of Student Affairs may grant permission for solicitations and sales by off–campus business concerns only when specifically requested to do so by a recognized University students [*sic*], faculty, or employee organization. Such permission,

when granted, will be subject to such limitations as the Dean of Student Affairs may prescribe.

CHARITABLE, POLITICAL, OR RELIGIOUS SOLICITATION.

As a general rule, representatives of off–campus political, religious, and charitable groups will not be permitted to solicit on campus. However, individuals acting on behalf of candidates for public office or of *bona fide* political or religious organizations may obtain permission to sell or distribute their political or religious literature under the following guidelines:

1 Non–members of the University community who are acting on behalf of candidates for public office or of *bona fide* political or religious organizations, and who wish to seek permission to distribute and/or sell political and religious literature on the campus should apply to the Office of the Dean of Student Affairs between the hours of 9:00 a. m. and 5:00 p. m. Monday through Friday.

2 In choosing among the six sites where political and religious literature may be sold or distributed which were recommended by the Council of the Princeton University Community preference will be given to three locations: the area adjacent to the Student Center (on the Library side), the area surrounding Alexander Hall, and the area around the University Store.

3 Permission for the sale or distribution of political and religious literature may be granted only for the hours between 9:00 a. m. and 5:00 p. m. seven days a week.

4 The number of persons who, at any one time, will be permitted to sell or distribute literature for any particular candidate or group is limited to one or two at any given location, and to five or six on the campus as a whole.

5 The number of occasions on which candidates or groups will be permitted to sell or distribute literature will be limited normally to six visits during a given month. In special situations, such as an approaching election, more frequent visits may be permitted.

6 The total number of people distributing or selling literature at any one location on campus will be limited. When several groups wish to distribute literature at a particular location, in accordance with general University policy, preference in use of campus facilities will be given to members of the University community. In acting on requests from members of outside political or religious groups and representatives of candidates, individuals who are sponsored by members of the University community will be preferred.

7 Harassment of members of the University community by those selling or distributing literature, or sale or distribution outside of the hours or locations for which permission has been granted, will be cause for the immediate revocation of permission for the sale or distribution of literature by those involved.

8 Decisions regarding requests under these guidelines will need to take into account both any special circumstances that may relate to University activities and the burden that permission to sell or distribute political or religious literature may place on the University's security forces and administrative staffs.

Schmid stipulated that he had been aware in April 1978 that the existing University policy was against allowing "persons not connected with the University to enter campus uninvited and without sponsorship for the purpose of soliciting support or contributions." He had, in fact, previously been told on February 15, 1978 that his presence and activity on campus without permission were "forbidden" and that he "was subject to arrest for trespassing if he entered on campus to solicit again [without University permission]."

Schmid was arrested for trespass on University property on the day in question by a member of the Princeton University Security Department and charged as a disorderly person under *N.J.S.A.* 2A:170–31.[3] He was convicted of trespass in Princeton Borough Municipal Court on October 20, 1978 and fined $15 plus $10 costs. On February 20, 1979, following a trial *de novo* in Superior Court, Law Division, pursuant to *R.* 3:23 ·8, Schmid was again found guilty of trespass and the same monetary penalty was reimposed. While defendant's appeal was pending in the Appellate Division, this Court directly certified the case under *R.* 2:12–1. 81 *N.J.* 344 (1979). At the Court's invitation, Princeton University intervened in this appeal. The Association of Independent Colleges and Universities in New Jersey also filed an *amicus curiae* brief with this Court.

---

[University Regulations as passed by the Council of the Princeton University Community, May 1975, as amended 1979.]

3That statute provided in pertinent part that

[a]ny person who trespasses on any lands ... after being forbidden so to trespass by the owner, occupant, lessee or licensee thereof, or after public notice on the part of the owner, occupant, lessee or licensee forbidding such trespassing, which notice has been conspicuously posted adjacent to a usual entry way thereto, is a disorderly person and shall be punished by a fine of not more than $50. [*N.J.S.A.* 2A:170–31.]

The offense covered by that statute, repealed by *L.* 1978, *c.* 95, § 2C:98–2 (effective September 1, 1979), is now contained in the New Jersey Code of Criminal Justice as *N.J.S.A.* 2C:18–3 (*L.* 1978, *c.* 95, § 2C:18–3, effective September 1, 1979). The correct statute to be applied here, of course, is *N.J.S.A.* 2A:170–31, which was in effect at the time of the alleged offense. See *N.J.S.A.* 2C:1–1(b).

Defendant contends on this appeal that his trespass conviction offends both the federal and the State Constitutions. He specifically asserts that his conduct-- distributing political literature on the main campus of Princeton University constituted an exercise of his freedoms of speech and assembly, an exercise protected both by the First Amendment to the United States Constitution and by Article I, paragraphs 6 and 18 of the New Jersey Constitution; he maintains that the University was thus constitutionally obligated to permit this activity on its campus. In opposition, the State and the University contend that defendant's conduct encroached unlawfully upon legitimate and protectable private property rights. They argue that the University as a private entity had not undertaken state governmental action and had not invited or made a public use of its property sufficient to subject it to the strictures of the speech and assembly guarantees under either the federal or the State constitution. For these reasons, they urge that the University, in prosecuting Schmid for trespass upon private property, did not violate his individual constitutional rights.

We now address the respective federal and State constitutional issues framed by this appeal.

## II

■ Defendant asserts initially that his conviction in this case violated his rights under the First Amendment to the United States Constitution. The First Amendment was designed by its framers to foster unfettered discussion and free dissemination of opinion dealing with matters of public interest and governmental affairs. *Mills v. Alabama*, 384 *U.S.* 214, 218 · 219, 86 *S.Ct.* 1434, 1436, 16 *L.Ed.*2d 484, 488 (1966); *State v. Miller*, 83 *N.J.* 402, 412 (1980). It embraces the freedom to distribute information and materials to all citizens, a freedom "clearly vital to the preservation of a free society." *Martin v. Struthers*, 319 *U.S.* 141, 146–147, 63 *S.Ct.* 862, 864--865, 87 *L.Ed.* 1313, 1319 (1943); see *Lovell v. Griffin*, 303 *U.S.* 444, 450 · 451, 58 *S.Ct.* 666, 668–669, 82 *L.Ed.* 949, 953 (1938). The guarantees of the First Amendment are effectuated against potential state interference

through the Fourteenth Amendment by limiting the extent to which states can restrict individuals in the exercise of rights of speech and assembly. See, *e. g., Schneider v. State*, 308 *U.S.* 147, 160, 60 *S.Ct.* 146, 150, 84 *L.Ed.* 155, 164 (1939). The First Amendment, however, does not similarly protect rights of speech and assembly against interference or impairment by private individuals. The Amendment imposes no limitations upon "the owner of private property used nondiscriminatorily for private purposes only," even though such use may trench upon the speech and assembly activities of other persons. *Lloyd Corp. v. Tanner*, 407 *U.S.* 551, 92 *S.Ct.* 2219, 2228, 33 *L.Ed.2d* 131, 142 (1972).

It is clear that public colleges and universities, as instrumentalities of state government, are not beyond the reach of the First Amendment. *Healy v. James*, 408 *U.S.* 169, 180, 92 *S.Ct.* 2338, 2345, 33 *L.Ed.2d* 266, 279 (1972). A public college or university, created or controlled by the state itself, is an arm of state government and, thus, by definition, implicates state action. *Powe v. Miles*, 407 *F.2d* 73, 82 (2 Cir. 1968); see *American Future Systems, Inc. v. Pennsylvania State Univ.*, 618 *F.2d* 252, 255 (3 Cir. 1980).

A private college or university, however, stands upon a different footing in relationship to the state. Such an institution is not the creature or instrument of state government. Even though such an institution may conduct itself identically to its state–operated counterparts and, in terms of educational purposes and activities, may be virtually indistinguishable from a public institution, see McKay, "The Student As Private Citizen," 45 *Denver L.J.* 558, 560 (1968), a private college or university does not thereby either operate under or exercise the authority of state government. Hence, the state nexus requirement that triggers the application of the First Amendment is not readily met in the case of a private educational institution. See, *e. g., Grafton v. Brooklyn Law School*, 478 *F.2d* 1137, 1143 (2 Cir. 1973); *Blackburn v. Fisk Univ.*, 443 *F.2d* 121, 123 (6 Cir. 1971); see generally Annot., "Action of Private Institution of Higher Education as Constituting State Action, or Action Under Color

of Law, for Purposes of Fourteenth Amendment and 42 *U.S. C.A.* § 1983," 37 *A.L.R.Fed.* 601 (1978).

Notwithstanding the primary thrust of the First Amendment against state governmental interference with expressional freedoms, the guarantees of this Amendment may under appropriate conditions be invoked against nongovernmental bodies. In particular settings, private entities, including educational institutions, may so impact upon the public or share enough of the essential features of governmental bodies as to be engaged functionally in "state action" for First Amendment purposes. The more focused inquiry therefore must be turned to those circumstances that can subject an entity of essentially nongovernmental or private character to the requirements imposed by the First Amendment.

One test of such state action involves the presence of an interdependent or symbiotic relationship between the private entity and the state government. This standard was utilized in *Burton v. Wilmington Parking Auth.*, 365 *U.S.* 715, 81 *S.Ct.* 856, 6 *L.Ed.*2d 45 (1961), in which the Supreme Court held that a privately–owned restaurant which leased premises in a government–owned and government--maintained parking garage was subject to the Equal Protection Clause of the Fourteenth Amendment; the restaurant thus could not refuse to serve blacks. The Court stressed that the parking facility was essentially a government building engaged in a governmental purpose and that the State and the restaurant mutually benefited from their "joint participation" in the operation. 365 *U.S.* 723--726, 81 *S.Ct.* at 860–862, 6 *L.Ed.*2d at 51–52.

Another basis for determining the existence of state action is the extent of direct governmental regulation of the private entity.[4] This standard was applied in *Public Utilities Comm'n v.*

---

[4]There appears to be some confusion as to whether this second basis for state action has totally supplanted the earlier *Burton* symbiotic relationship test. Some courts, in light of *Jackson v. Metropolitan Edison*, 419 *U.S.* 345, 95 *S.Ct.* 449, 42 *L.Ed.*2d 477 (1974), appear to have adopted the view that the

*Pollak*, 343 *U.S.* 451, 463, 72 *S.Ct.* 813, 821, 96 *L.Ed.* 1068, 1077 (1952), wherein the Supreme Court held that the First and Fifth Amendments to the federal Constitution were applicable to a policy decision made by a private transit company operating in the heavily–regulated field of public transportation because that decision was subject to approval by a governmental agency. The governmental regulation or control standard, however, is fairly difficult to administer as a means for positing state action. The Supreme Court has stated that the mere fact that a business is subject to extensive state regulation will not in and of itself convert the actions of that business entity into state action. *Jackson v. Metropolitan Edison Co.*, 419 *U.S.* 345, 350, 95 *S.Ct.* 449, 453, 42 *L.Ed.*2d 477, 483-484 (1974). There must be demonstrated a "sufficiently close nexus" between the state regulation and the allegedly unconstitutional actions of the regulated business entity before it can be said that those actions emanate from or can be attributed to state government. *Id.* at 351, 95 *S.Ct.* at 453, 42 *L.Ed.*2d at 484. *Cf. Moose Lodge No. 107 v. Irvis*, 407 *U.S.* 163, 171, 92 *S.Ct.* 1965, 1970, 32 *L.Ed.*2d 627, 636–637 (1972) (Equal Protection Clause of Fourteenth Amendment did not apply to private club because state's regulation of club's liquor license did not directly involve state in club's racially–exclusive practices).

Both of these approaches for ascertaining state action have been followed in challenges to the actions of private colleges or universities as violative of First Amendment rights. Among the factors most often marshaled to show state action are that the institution received government funds, that the institution was performing a governmental function by providing education, that it was state–accredited or state–chartered or was otherwise highly regulated by the state, that the college derived economic benefit from tax exemptions, that it indirectly enforced governmental laws, or, in some instances, that the college had been built on formerly public lands. See, *e. g., Blackburn v. Fisk*

*Burton* test is no longer viable. See *Greene v. Johns Hopkins Univ.*, 469 *F.Supp.* 187, 194–195 (D.Md.1979) (discussing this confusion).

*Univ., supra,* 443 *F.*2d at 122-124. See also, Cohen, "The Private–Public Legal Aspects of Institutions of Higher Education," 45 *Denver L.J.* 643, 645–647 (1968); Schubert, "State Action and the Private University," 24 *Rutgers L.Rev.* 323, 334-347 (1970). For the most part, however, such challenges have failed. See *Cannon v. Univ. of Chicago,* 559 *F.*2d 1063 (7 Cir. 1977), rev'd on other grounds, 441 *U.S.* 677, 99 *S.Ct.* 1946, 60 *L.Ed.*2d 560 (1979); *Krohn v. Harvard Law School,* 552 *F.*2d 21, 24 (1 Cir. 1977); *Greenya v. George Washington Univ.,* 512 *F.*2d 556, 559-562 (D.C. Cir. 1975), *cert.* den., 423 *U.S.* 995, 96 *S.Ct.* 422, 46 *L.Ed.*2d 369 (1975); *Blouin v. Loyola Univ.,* 506 *F.*2d 20, 22 (5 Cir. 1975) (*per curiam*); *Wahba v. New York Univ.,* 492 *F.*2d 96, 101 (2 Cir. 1974), *cert.* den., 419 *U.S.* 874, 95 *S.Ct.* 135, 42 *L.Ed.*2d 113 (1974); *Blackburn v. Fisk Univ., supra,* 443 *F.*2d at 123; *Browns v. Mitchell,* 409 *F.*2d 593, 594-595 (10 Cir. 1969); *Greene v. Johns Hopkins Univ.,* 469 *F.Supp.* 187, 196-198 (D.Md.1979); *Huff v. Notre Dame High School of West Haven,* 456 *F.Supp.* 1145, 1147–1149 (D.Conn.1978); *Pendrell v. Chatham College,* 370 *F.Supp.* 494, 499 (W.D.Pa.1974); *Furumoto v. Lyman,* 362 *F.Supp.* 1267, 1276–1280 (N.D.Cal.1973); *Grossner v. Trustees of Columbia Univ.,* 287 *F.Supp.* 535, 546-549 (S.D.N.Y.1968); *contra, Braden v. Univ. of Pittsburgh,* 552 *F.*2d 948, 961 (3 Cir. 1977); *Rackin v. University of Pennsylvania,* 386 *F.Supp.* 992 (D.C.Pa.1974).[5]

---

[5]These cases, evincing the difficulty of positing "state action" to private educational institutions under the First Amendment, generally have dealt with the internal affairs of the particular institutions, such as faculty employment and student discipline, and not with the conduct of members of the general public *vis–a–vis* the institutions, as here. It may be that such a distinction would, in an appropriate case, warrant a different and less rigorous standard as to what constitutes "state action" for First Amendment purposes.

In such cases, where the rights of the general public are at stake, the importance attached to the free exercise of First Amendment rights could be a potent counterpoise against the need for a private university to retain control of its own internal affairs. See *Weise v. Syracuse University,* 522 *F.*2d 397, 406 (2 Cir. 1975) ("a consideration of whether there is state action necessarily entails a balancing process"). *Cf., e. g., Williams v. Howard Univ.,* 528 *F.*2d 658, 660 (D.C. Cir. 1976), *cert.* den., 429 *U.S.* 850, 97 *S.Ct.* 138, 50 *L.Ed.*2d 123 (1976); *Spark v. Catholic Univ. of America,* 510 *F.*2d

The record reveals that Princeton University, though privately owned and controlled, is involved in a continuous relationship with the State. The University is a state accredited educational institution; it participates in and receives, as do other public and private educational institutions, the advantages of certain State programs, *e. g., The New Jersey Educational Facilities Authority Law, N.J.S.A.* 18A:72A-1 *et seq.* (authority created to issue bonds for capital improvements and new construction on the campuses both of public and private post secondary educational institutions); *The Higher Education Assistance Authority Law, N.J.S.A.* 18A:72-1 *et seq.* (creating fund to provide loans to New Jersey students attending public or private post secondary educational institutions). Its property and buildings on the central campus, with the exception of its ice skating and hockey facility and its campus parking lots, are tax-exempt. The University also receives state budgeted funds through *The Independent College and University Assistance Act, N.J.S.A.* 18A:72B-15 *et seq.* In addition, according to the stipulations of the parties, the University Security Department, some of whose

---

1277, 1281–1282 (D.C. Cir. 1975) (*per curiam*); *Jackson v. Statler Foundation*, 496 *F.*2d 623, 629 (2 Cir. 1974), *cert.* den., 420 *U.S.* 927, 95 *S.Ct.* 1124, 43 *L.Ed.*2d 397 (1975) (These cases indicate that when racial discrimination has been assertedly practiced by a private entity contrary to the Equal Protection Clause of the Fourteenth Amendment, a less exacting test is appropriate for determining the presence of "state action."). The balancing of the interests of the public in expressional freedoms and the importance of the autonomy and independence of private educational institutions is addressed later in our opinion. See discussion *infra* at 566–567.

Additionally, the differences between public and private educational institutions may, in many situations, be negligible. See McKay, "The Student As Private Citizen," 45 *Denver L.J.* 558, 560 (1968). In such cases, the same First Amendment protections might conceivably be required. *Cf. Marsh v. Alabama*, 326 *U.S.* 501, 66 *S.Ct.* 276, 90 *L.Ed.* 265 (1946) (private company town subject to First Amendment where performing same functions as municipality). Given the importance attached to higher education and the significant social contributions of private educational institutions, a wide disparity between the nature and scope of permitted speech at private universities and that which must be allowed at public universities would seem anomalous and undesirable. In light of the decision reached in this case, however, we need do no more than note here these added lines of analysis.

employees are deputized to make arrests under the laws of New Jersey, is primarily responsible for providing security services for the entire University community.

Nonetheless, this congeries of facts does not equate with state action on the part of Princeton University. See, *e. g., Blackburn v. Fisk Univ., supra,* 443 *F.*2d at 122–124. Princeton University is, indisputably, predominantly private, unregulated and autonomous in its character and functioning as an institution of higher education. The interface between the University and the State is not so extensive as to demonstrate a joint and mutual participation in higher education or to establish an interdependent or symbiotic relationship between the two in the field of education.

Moreover, the degree of State regulation does not evince a "close nexus" between the State and Princeton University's policies, particularly with regard to the public's access to the University campus and facilities and, even more particularly, with regard to either the distribution of political literature or other expressional activities on University property. Furthermore, the resort by Princeton University to the State's trespass laws to protect its own rights of property does not, as suggested in the separate opinion of Justice Pashman, *post* at 573, constitute state action for First Amendment purposes. In the absence of a protectable First Amendment right in the individual, the property owner's recourse to appropriate and otherwise neutral penal sanctions to protect its legitimate interests does not constitute action by the State nor clothe the property owner with a state identity for First Amendment purposes. See *Bell v. Maryland,* 378 *U.S.* 226, 327–333, 84 *S.Ct.* 1814, 1869–1872, 12 *L.Ed.*2d 822, 856–859 (1964) (Black, J., dissenting).[6]

---

[6]To the extent *Shelley v. Kraemer,* 334 *U.S.* 1, 68 *S.Ct.* 836, 92 *L.Ed.* 1161 (1948) might assertedly support the notion that the invocation of state authority which in and of itself effectuates racial discrimination constitutes state action under the Fourteenth Amendment, it has been noted that several cases have recognized the existence of a double "state action" standard, *i. e.,* "a less onerous test for cases involving racial discrimination, and a more rigorous standard for other claims." *Jackson v. Statler Foundation,* 496 *F.*2d 623 (2 Cir. 1974). See also, *e. g., Greenya v. George Washington Univ.,* 512 *F.*

 Although Princeton University is thus not subject to First Amendment obligations by virtue of a joint relationship with or direct regulation by the State, there remains to be considered still another standard for determining First Amendment applicability, *viz*, the "public function doctrine." See *Flagg Bros., Inc. v. Brooks*, 436 *U.S.* 149, 158, 98 *S.Ct.* 1729, 1734, 56 *L.Ed.*2d 185, 195 (1978). Even though a private entity is not engaged in "state action," it may nevertheless be required to honor First Amendment rights if its property is sufficiently devoted to public uses. See *Marsh v. Alabama*, 326 *U.S.* 501, 506, 66 *S.Ct.* 276, 278, 90 *L.Ed.* 265, 268 (1946). "The more an owner for his advantage opens up his property to use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506, 66 *S.Ct.* at 278, 90 *L.Ed.* at 268.

A company–owned town which possessed all of the characteristics of a municipality, providing full access to the public to all of its facilities including its shopping district, was held to be subject to the strictures of the First Amendment. *Id.* at 503, 508–509, 66 *S.Ct.* at 277, 280, 90 *L.Ed.* at 266–267, 270. In *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 *U.S.* 308, 317, 88 *S.Ct.* 1601, 1608, 20 *L.Ed.*2d 603, 611 (1968), the Supreme Court found "striking" similarities between a company town, as described in *Marsh v. Alabama, supra*, and a privately–owned shopping mall. Specifically noting the common sidewalks and parking areas and the invitation to the public to use the property, the Court held that it was a violation of the First Amendment to apply a trespass statute to union members picketing a non–unionized supermarket located in the privately–owned shopping mall. *Id.* at 322–323, 88 *S.Ct.* at 1610–1611, 20 *L.Ed.*2d at 614–615; see T. Emerson, *The System of Freedom of Expression* 307–310 (1970).

---

2d 556, 560 (D.C. Cir. 1975), *cert. den.*, 423 *U.S.* 995, 96 *S.Ct.* 422, 46 *L.Ed.*2d 369 (1975); *Aasum v. Good Samaritan Hospital*, 542 *F.2d* 792, 794 (9 Cir. 1976). But see *contra, Isaacs v. Bd. of Trustees of Temple Univ.*, 385 *F.Supp.* 473, 485 n. 11 (E.D.Pa.1974). See *supra* at 546 n.5.

A different result was reached in *Lloyd Corp. v. Tanner, supra.* The majority of the Supreme Court in *Lloyd* held that a privately–owned shopping mall could bar the distribution of anti–war handbills on mall property. It distinguished *Logan Valley* on the ground that the subject matter of the handbills in *Lloyd* was unrelated to the shopping center's business. 407 *U.S.* at 564–565, 92 *S.Ct.* at 2227, 33 *L.Ed.*2d at 140. With respect to the public use of the property, the Court noted that the invitation for public use of the shopping mall was not "open ended" or for "any and all purposes." *Id.* at 565, 92 *S.Ct.* at 227, 33 *L.Ed.* 2d at 140. It also found significance in the fact that there were adequate alternative means of communication, *i. e.,* that there were public areas directly outside the mall that were available for the distribution of the anti ·war handbills. *Id.* at 566 -567, 92 *S.Ct.* at 2227–2228, 33 *L.Ed.*2d at 141. The Court reinforced the *Lloyd* holding in *Hudgens v. National Labor Relations Board,* 424 *U.S.* 507, 96 *S.Ct.* 1029, 47 *L.Ed.*2d 196 (1976), wherein it ruled that striking warehouse employees who sought to picket their employer's retail store located in a privately owned shopping center were not protected under the First Amendment. A majority of the *Hudgens* Court supported the view that *Lloyd* effectively overruled and substantially constricted the reach of *Logan Valley.* See *Hudgens v. NLRB, supra,* 424 *U.S.* 523, 524, 535, 96 *S.Ct.* at 1038, 1039, 1044, 47 *L.Ed.*2d at 209, 210, 216. Very recently, in *PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 78–88, 100 *S.Ct.* 2035, 2039–2041, 64 *L.Ed.*2d 741, 751–752 (discussed *infra* at 552), the Supreme Court recapitulated this judicial history and observed that the rationale of *Logan Valley* had been "substantially repudiated" by *Lloyd* and had been actually overruled by *Hudgens.*

While the Supreme Court has now indicated that the *Logan Valley* decision has been overruled, it did not reject or disapprove of *Lloyd Corp. v. Tanner,* (although the continued utility of *Lloyd* has been questioned. See concurring opinion of Justice Schreiber, *post* at 579).

If the *Lloyd* approach were applied in the present case, it would be difficult to conclude under the circumstances disclosed

by the record that Princeton University is directly subject to
First Amendment strictures. See generally, Note, "First
Amendment and the Problem of Access to Migrant Labor Camps
after *Lloyd Corp. v. Tanner*," 61 *Cornell L.Rev.* 560, 578 580.
For example, in assessing the availability of alternative means
of communication, there are public streets, sidewalks, parking
areas, and a train station immediately contiguous to Princeton
University's main campus and most of its buildings and facili-
ties; a major street with public sidewalks bisects the University
campus. These numerous public areas apparently furnish to
members of the public, as well as the college community, ample
alternative locations other than the property of the University
itself as means for the dissemination and exchange of informa-
tion, views, and ideas.

Were we to concentrate upon the other aspects of the *Lloyd*
standard (notwithstanding their precedential diminution as a
result of *Hudgens*), those focusing upon the scope of the public's
invitation and the nature of the expressional activities in rela-
tion to the use of private property, the applicability of the First
Amendment is less clear. Arguably, there are a broad public
invitation and wide use of University property that serve to
encourage expressional rights and are conducive to the educa-
tional goals of Princeton University. (See discussion *infra* at
564–566). Nevertheless, it must be recognized that the public
uses and expressional activities that are permitted by the Uni-
versity are subordinate to its overall educational policies. In
this sense, while the invitation to the public is broad, it is not
truly "open--ended" or for "any and all purposes." *Lloyd Corp.
v. Tanner, supra,* 407 *U.S.* at 565, 92 *S.Ct.* at 227, 33 *L.Ed.2d* at
140. Therefore, although Princeton University's *raison d'etre* is
more consonant with free speech and assembly principles than a
shopping center's purposes might be, the attachment of First
Amendment requirements to the University by virtue of the
general public's permitted access to its property would still be
problematic.

If we were to examine whether Princeton University has in
the pervasive and all--inclusive sense of *Marsh v. Alabama,*

*supra*, undertaken to act as a local government body, the applicability of the First Amendment remains doubtful. The nature of college community life as determined by Princeton University, even with its residential characteristics, would not seem to invest the University with the fundamental attributes of a government substitute or surrogate in the manner deemed critical for positing state action in *Marsh v. Alabama, supra.* (See discussion *supra* at 549). A private educational institution such as Princeton University involves essentially voluntary relationships between and among the institution and its students, faculty, employees, and other affiliated personnel, and the life and activities of the individual members of this community are directed and shaped by their shared educational goals and the institution's educational policies. The public's invitation to use college facilities is incident to the educational life of the institution and must comport and be integrated with its educational endeavors. It is dubious therefore whether Princeton can or should be regarded as a quasi–governmental enclave or the functional equivalent of a "company town," which has all of the characteristics of a municipality, for First Amendment purposes. *Powe v. Miles*, 407 *F.*2d 73, 80 (2 Cir. 1968); *McLeod v. College of Artesia*, 312 *F.Supp.* 498, 502 (D.N.M.1970); *Grossner v. Trustees of Columbia Univ.*, 287 *F.Supp.* 535, 549 (S.D.N.Y.1968).

In attempting to pull together these diverse strands of constitutional doctrine, it is apparent that First Amendment principles as applied to the owners of private property are still evolving. The precise question in this case has not been definitively resolved or even clearly foreshadowed by extant decisional authority. Furthermore, invoking First Amendment strictures against private property owners, as has been noted, necessarily engenders countervailing concerns for legitimate private property rights, *e. g., PruneYard Shopping Center v. Robins, supra.* In this case, the difficulty of the decisional task and the uncertainty of its solution posed by this consideration are further compounded because the private property is an educational institution. Such institutions, in addition to their own protectable private property interests, are committed to the achievement of

important societal educational objectives which are generally consistent with First Amendment purposes. While these purposes may temper the protections accorded private property, the legitimate and genuine property interests of educational institutions should not be denuded because of the apparent coincidence between the goals of higher education and the First Amendment.

We are thus confronted with strong crosscurrents of policy that must be navigated with extreme care in reaching any satisfactory resolution of the competing constitutional values under the First Amendment in this case. These concerns persuade us to stay our hand in attempting to decide the question of whether the First Amendment applies to Princeton University in the context of the present appeal. Defendant, moreover, has presented compelling alternative grounds for relief founded upon the State Constitution, which we now reach.

### III

Defendant asserts that under the State Constitution he is afforded protection of his expressional rights even if it is not clear that the First Amendment would serve to grant that protection. The United States Supreme Court has recently acknowledged in the most clear and unmistakable terms that a state's organic and general law can independently furnish a basis for protecting individual rights of speech and assembly. *PruneYard Shopping Center v. Robins, supra,* 447 *U.S.* at 80-81, 100 *S.Ct.* at 2040, 64 *L.Ed.*2d at 752. The view that state constitutions exist as a cognate source of individual freedoms and that state constitutional guarantees of these rights may indeed surpass the guarantees of the federal Constitution has received frequent judicial expression. See, *e. g., PruneYard Shopping Center v. Robins, supra,* 447 *U.S.* 74, 78–81, 100 *S.Ct.* 2035, 2039–2040, 64 *L.Ed.*2d at 750, 752; *id.* at 91-92, 100 *S.Ct.* at 2046, 64 *L.Ed.*2d at 758 (Marshall, J., concurring); *Oregon v. Hass,* 420 *U.S.* 714, 719, 95 *S.Ct.* 1215, 1219, 43 *L.Ed.*2d 570, 575–576 (1975); *Cooper v. California,* 386 *U.S.* 58, 62, 87 *S.Ct.* 788, 791, 17 *L.Ed.*2d 730, 734 (1967); *Armstrong v. Egeler,*

563 *F.2d* 796, 801 (6 Cir. 1977); *Shiras v. Britt, Ark.*, 589 *S.W.2d*
18, 19 (Sup.Ct.1979); *People v. Rucker*, 26 *Cal.3d* 368, 389‑391,
605 *P.2d* 843, 856, 162 *Cal.Rptr.* 13, 26 (Sup.Ct.1980); *People v.
Privitera*, 23 *Cal.3d* 697, 710, 591 *P.2d* 919, 926, 153 *Cal.Rptr.* 431,
438 (Sup.Ct.1979), cert. den., 444 *U.S.* 949, 100 *S.Ct.* 419, 62 *L.Ed.*
2d 318 (1979); *State v. Kaluna*, 55 *Hawaii* 361, 369 n.6, 520 *P.2d*
51, 58 n.6 (Sup.Ct.1974); *O'Connor v. Johnson*, 287 *N.W.2d* 400,
405 (Minn.Sup.Ct.1979); *Keene Publishing Corp. v. Cheshire
County Superior Court, N.H.*, 406 *A.2d* 137, 138 (Sup.Ct.1979);
*Cooper v. Morin*, 49 *N.Y.2d* 69, 79, 399 *N.E.2d* 1188, 1194, 424
*N.Y.S.2d* 168, 174 (Ct.App.1979), cert. den., 446 *U.S.* 984, 100
*S.Ct.* 2965, 64 *L.Ed.2d* 840 (1980); *Westchester Rockland News-
papers, Inc. v. Leggett*, 48 *N.Y.2d* 430, 436, 442, 399 *N.E.2d* 518,
521, 525, 423 *N.Y.S.2d* 630, 634, 638 (Ct.App.1979); *Sharrock v.
Dell Buick–Cadillac, Inc.*, 45 *N.Y.2d* 152, 160 161, 379 *N.E.2d*
1169, 1173, 408 *N.Y.S.2d* 39, 43‑44 (Ct.App.1978); *People v.
Onofre*, 72 *A.D.2d* 268, 270, 424 *N.Y.S.2d* 566, 568 (App.Div.
1980);[7] see Brennan, "State Constitutions and the Protection of
Individual Rights," 90 *Harv.L.Rev.* 489, 491, 495 (1977); Coun-
tryman, "The Role of a Bill of Rights in a Modern State
Constitution: Why a State Bill of Rights?", 45 *Wash.L.Rev.* 454,
456–459, 470–474 (1970); Falk, "Foreword The State Constitu-
tion: A More Than 'Adequate' Nonfederal Ground," 61 *Cal.L.
Rev.* 273, 281–285 (1973); Force, "State 'Bills of Rights': A Case
of Neglect and the Need for a Renaissance," 3 *Valparaiso
U.L.Rev.* 125, 129, 142–143 (1969); Howard "State Courts and
Constitutional Rights in the Day of the Burger Court," 62
*Va.L.Rev.* 873, 874–877, 910‑911 (1976); Howard, "The Supreme
Court and Federalism," in *The Courts: The Pendulum of Feder-*

---

[7]This recent upsurge in cases demonstrating the increasing willingness of
state courts to rest their decisions upon state constitutions as "adequate and
independent state grounds," *Herb v. Pitcairn*, 324 *U.S.* 117, 125, 65 *S.Ct.* 459,
463, 89 *L.Ed.* 789, 794 (1945), has been characterized as a " 'phoenix‑like
resurrection of federalism.' " Howard, "The Supreme Court and Federalism,"
in *The Courts: The Pendulum of Federalism* 49, 72 (Roscoe Pound–American
Trial Lawyers Foundation 1979) (quoting Address by Justice Mosk, Bicenten-
nial Conference, New York University School of Law, April 28, 1976); see
also Mosk, "The New States' Rights," 10 *Cal.L.Enforcement* 81, 82 (1976).

*alism* 49, 71–76 (Roscoe Pound American Trial Lawyers Foundation 1979); Paulsen, "State Constitutions, State Courts and First Amendment Freedoms," 4 *Vand.L.Rev.* 620, 621 (1951); Project Report, "Toward an Activist Role for State Bills of Rights," 8 *Harv.C.R.--C.L.L.Rev.* 271, 285 (1973).

On numerous occasions our own courts have recognized the New Jersey Constitution to be an alternative and independent source of individual rights. See, *e. g., Smith v. Penta,* 81 *N.J.* 65, 73–76 (1979); *King v. South Jersey Nat'l Bank,* 66 *N.J.* 161, 177 (1974); *id.* at 193–194 (Pashman, J., dissenting). Mr. Justice Brennan in his oft–cited piece in 90 *Harv.L.Rev., supra,* at 499 drew support for this proposition from *State v. Johnson,* 68 *N.J.* 349, 353 n.2 (1975), wherein Justice Sullivan had observed that although the New Jersey constitutional provision relating to searches and seizures was identical to the federal Fourth Amendment provisions, " 'we have the right to construe our State constitutional provision in accordance with what we conceive to be its plain meaning.' "

The guarantees of our State Constitution have been found to extend to a panoply of rights deemed to be most essential to both the quality of individual life and the preservation of personal liberty. See, *e. g., Levine v. Institutions & Agencies Dept. of N. J.,* 84 *N.J.* 234, 244 -249, 258 (1980) (right to an education); *id.* at 273 (Pashman, J., dissenting); *State v. Ercolano,* 79 *N.J.* 25, 30, 34 (1979) (privacy based freedom from "unreasonable searches and seizures"); *State v. Slockbower,* 79 *N.J.* 1, 4 n.2 (1979) (same); *State v. Tropea,* 78 *N.J.* 309, 313, n.2 (1978) (double jeopardy and fundamental fairness); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 79 (1978) (equal protection); *State v. Saunders,* 75 *N.J.* 200, 216 -217 (1977) (right of sexual privacy); *id.* at 224 -225 (Schreiber, J., concurring); *In re Quinlan,* 70 *N.J.* 10, 19, 40- 41, 51 (1976), *cert.* den. *sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976) (right of choice to terminate life -support systems as aspect of right of privacy); *State v. Johnson, supra,* 68 *N.J.* at 353 (freedom from "unreasonable searches and seizures"); *State v. Gregory,* 66 *N.J.* 510, 513 -514 (1975) (double jeopardy and

fundamental fairness); *Robinson v. Cahill*, 62 *N.J.* 473, 482, 509 (1973), *cert.* den. *sub nom. Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973) (*Robinson I*) (right to an education); *Worden v. Mercer County Bd. of Elections*, 61 *N.J.* 325, 345–346 (1972) (right to vote); *Cooper v. Nutley Sun Printing Co.*, 36 *N.J.* 189, 191, 195 -196 (1961) (right of employees to organize and bargain collectively); *State v. Hannah*, 171 *N.J.Super.* 325, 330 (App.Div.1979) (right to a public criminal trial inheres in the public); *Freedman v. New Jersey State Police*, 135 *N.J.Super.* 297, 300 301 (Law Div.1975) (freedom of the press); *Gray v. Serruto Builders, Inc.*, 110 *N.J.Super.* 297, 306–307 (Ch.Div.1970) (right to be free from racial discrimination); *cf. State v. Carpentieri*, 82 *N.J.* 546, 572 -573 (1980) (Pashman, J., dissenting) (freedom from "unreasonable searches and seizures"). *Contra, Anderson v. Sills*, 143 *N.J.Super.* 432, 442 (Ch.Div.1976). As Justice Schreiber pointed out in his concurring opinion in *State v. Saunders, supra*, with respect to fundamental personal rights, "individuals have freedom to think, decide and act as they see fit[; t]his freedom is an aspect of their right of privacy" guaranteed by the New Jersey Constitution, *N.J.Const.* (1947), Art. I, par. 1, quite apart from the federal Constitution. 75 *N.J.* at 225.

Most recently, this Court recognized through Chief Justice Wilentz that freedom of the press, intimately associated with individual expressional and associational rights, is strongly protected under the State Constitution (*N.J.Const.* (1947), Art. I, par. 6), state statutory enactments (*e. g., N.J.S.A.* 2A:84A 21 *et seq.* ("shield law")), and state decisional law. See *State v. Boiardo*, 83 *N.J.* 350, 353 (1980) (*Boiardo II*); *State v. Boiardo*, 82 *N.J.* 446, 458 (1980) (*Boiardo I*); *In re Farber*, 78 *N.J.* 259, 286 287 (Pashman, J., dissenting). The United States Supreme Court itself has acknowledged that the First Amendment, which implicates this important freedom, does not accord to it the degree of protection that may be available through state law. *Branzburg v. Hayes*, 408 *U.S.* 665, 706, 92 *S.Ct.* 2646, 2669, 33 *L.Ed.*2d 626, 654 (1972); see also, *e. g., Keene Publishing Corp. v. Cheshire County Superior Court, supra; Westchester Rockland Newspapers, Inc. v. Leggett, supra.*

A basis for finding exceptional vitality in the New Jersey Constitution with respect to individual rights of speech and assembly is found in part in the language employed. Our Constitution affirmatively recognizes these freedoms, *viz* :

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. . . . [*N.J.Const.* (1947), Art. I, par. 6.]

> The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances. [*N.J.Const.* (1947), Art. I, par. 18.]

■ The constitutional pronouncements, more sweeping in scope than the language of the First Amendment,[8] were incorporated into the organic law of this State with the adoption of the 1844 Constitution. *N.J.Const.* (1844), Art. I, pars. 5 and 18. They were, however, directly derived from earlier sources, *e. g.*, the free speech provision was modeled after Article 7, Section 8 of the 1821 Constitution of the State of New York (now *N.Y. Const.* (1938), Art. 1, § 8). Heckel, "The Bill of Rights" (Monograph), in 2 *Proceedings of the New Jersey Constitutional Convention of 1947*, 1336, 1344 (1951) (hereinafter Heckel, "Bill of Rights"); *id.* at 1357–1358. This early constitutional model itself has been recognized as constituting an independent source of protectable individual rights. See *Cooper v. Morin, supra*, 49 *N.Y.*2d at 79, 399 *N.E.*2d at 1194, 424 *N.Y.S.*2d at 174; *Westchester Rockland Newspapers, Inc. v. Leggett, supra*, 48 *N.Y.*2d at 436, 442, 399 *N.E.*2d at 521, 525, 423 *N.Y.S.*2d at 634, 638;

---

[8]Even if the language of the state constitutional and federal constitutional provisions were identical, this Court could give differing interpretations to the provisions. This option was noted by Justice Sullivan in *State v. Johnson*, 68 *N.J.* 349, 353 (1975). As Justice Mosk of the California Supreme Court has observed, "[i]t is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse." *People v. Brisendine*, 13 *Cal.*3d 528, 550, 531 *P.*2d 1099, 1113, 119 *Cal.Rptr.* 315, 329 (Sup.Ct.1975); see Note, "Expanding State Constitutional Protections and the New Silver Platter: After They've Shut the Door, Can They Bar the Window?", 8 *Loyola U.L.J.* 186, 192 (1976); see also Z. Chafee, *Free Speech in the United States* 5–6 (1941).

*Sharrock v. Dell Buick Cadillac, Inc., supra,* 45 *N.Y.*2d at 160 161, 379 *N.E.*2d at 1173, 408 *N.Y.S.*2d at 43 44.

Although our own courts have seldom been invited or required to view the New Jersey Constitution as a separate basis for delineating the scope of individual speech and assembly freedoms, the philosophy recognizing the importance of such rights has been frequently voiced. In a case decided last term dealing with such expressional rights in the context of municipal zoning restrictions, Justice Clifford observed as follows:

> [P]olitical speech . . occupies a preferred position in our system of constitutionally–protected interests. [*State v. Miller,* 83 *N.J.* 402, 411 (1980).]
>
> Where political speech is involved, our tradition insists that government "allow the widest room for discussion, the narrowest range for its restriction." [*Id.* at 412 (citation omitted).]

See *Adams Theatre Co. v. Keenan,* 12 *N.J.* 267, 277 (1953) (under the facts, there was a First Amendment violation in the denial of theatre license since "speech[, including the "performance of a play or show" (*id.* at 270),] is to be presumed to be protected speech and . . . the presumption is not the other way"); *State v. Butterworth,* 104 *N.J.L.* 579, 582 (E. & A.1928) (in overturning the unlawful assembly convictions of striking workers, Court observed that "[t]hese constitutional mandates [the First Amendment and *N.J.Const.* (1844), Art. I, par. 18], being in favor of the liberty of the people, must be given the most liberal and comprehensive construction").

Our courts have also on occasion observed that the State Constitution serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives. *Smith v. Penta, supra,* 81 *N.J.* at 74; *Gangemi v. Berry,* 25 *N.J.* 1, 8 9 (1957). Hence, the explicit affirmation of these fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them. See 16A *Am.Jur.*2d, *Constitutional Law,* § 439 at 208 (1979). It has been recognized that the State Constitution, as a wellspring of individual rights and liberties, may be directly enforceable, its protections not dependent even upon implementing legislation. *Peper v. Princeton Univ. Bd. of Trustees, supra,* 77 *N.J.* at 76–77. "Just as the Legislature cannot abridge constitutional

rights by its enactments, it cannot curtail them through its silence. . . ." *King v. South Jersey Nat'l Bank, supra,* 66 *N.J.* at 177 (Hughes, C. J.); see *Robinson I, supra,* 62 *N.J.* at 513; *Booker v. Plainfield Bd. of Educ.,* 45 *N.J.* 161, 173-175 (1965). Furthermore, the State Constitution imposes upon the State government an affirmative obligation to protect fundamental individual rights. See *In re Quinlan, supra,* 70 *N.J.* at 19 n.1; *cf. Mt. Laurel v. Public Advocate of N. J.,* 83 *N.J.* 522, 535-536 (1980) (state statute creating Office of Public Advocate to enforce the rights of citizens as an aspect of the public interest is not unconstitutional). This constitutional imperative, applicable to the freedoms of speech and assembly, comports with the presumed intent of those who framed our present Constitution. See Heckel, "Bill of Rights," *supra* at 1344-1345, 1357-1358.

Finally, the rights of speech and assembly guaranteed by the State Constitution are protectable not only against governmental or public bodies, but under some circumstances against private persons as well. It has been noted that in our interpretation of fundamental State constitutional rights, there are no constraints arising out of principles of federalism.[9] *Robinson I, supra,* 62 *N.J.* at 490. See also *King v. South Jersey Nat'l Bank, supra,* 66 *N.J.* at 192-193 (Pashman, J., dissenting) (citing *Cooper v. Nutley Sun Printing Co., supra,* 36 *N.J.* at 196-197; *Gray v. Serruto Builders, Inc., supra,* 110 *N.J.Super.* at 306-307; Countryman, "The Role of a Bill of Rights in a Modern State Constitution," *supra,* 45 *Wash.L.Rev.* at 473; Project Report, "Toward an Activist Role for State Bills of Rights," *supra,* 8 *Harv.C.R.- C.L.L.Rev.* at 338 (analyzing *N.J.Const.* (1947), Art. I, par. 6)). Hence, federal requirements concerning "state action," founded primarily in the language of the Fourteenth Amend-

---

[9]This point was expressed in dissent by Justice Pashman who stated that "one of the most important functions performed by state constitutional bills of rights which is not performed by the federal constitution is the protection of citizens against private oppression as well as oppression by the state." *King v. South Jersey Nat'l Bank,* 66 *N.J.* 161, 193 (1974) (Pashman, J., dissenting) (citations omitted).

ment and in principles of federal-state relations, do not have the same force when applied to state-based constitutional rights.

It is also clear that while state constitutions may be distinct repositories of fundamental rights independent of the federal Constitution, there nonetheless exist meaningful parallels between the federal Constitution and state constitutions, especially in the areas where constitutional values are shared, such as speech and assembly. Indicative of such mutuality, our State Constitution not only affirmatively guarantees to individuals the rights of speech and assembly, but also expressly prohibits government itself, in a manner analogous to the federal First and Fourteenth Amendments, from unlawfully restraining or abridging "the liberty of speech." *N.J.Const.* (1947), Art. I, par. 6.

We conclude, therefore, that the State Constitution furnishes to individuals the complementary freedoms of speech and assembly and protects the reasonable exercise of those rights. These guarantees extend directly to governmental entities as well as to persons exercising governmental powers. They are also available against unreasonably restrictive or oppressive conduct on the part of private entities that have otherwise assumed a constitutional obligation not to abridge the individual exercise of such freedoms because of the public use of their property. The State Constitution in this fashion serves to thwart inhibitory actions which unreasonably frustrate, infringe, or obstruct the expressional and associational rights of individuals exercised under Article I, paragraphs 6 and 18 thereof.

Against this constitutional backdrop must be addressed the question of whether the State Constitution's guarantees of speech and assembly under Article I, paragraphs 6 and 18 apply to the distribution of political materials by defendant Schmid upon the Princeton University campus on April 5, 1978. This question brings us to the heart of the problem—the need to balance within a constitutional framework legitimate interests in private property with individual freedoms of speech and assembly.

In the comparable federal setting, private property not used by the public or made available for public use does not ordinarily become subject directly to restrictions in favor of the public. *Hynes v. Oradell,* 425 *U.S.* 610, 619–620, 96 *S.Ct.* 1755, 1760, 48 *L.Ed.2d* 243, 252 (1976). Moreover, private property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp. v. Tanner, supra,* 407 *U.S.* at 569, 92 *S.Ct.* at 2229, 33 *L.Ed.2d* at 143. See *PruneYard Shopping Center v. Robins, supra,* 447 *U.S.* at 82, 100 *S.Ct.* at 2041, 64 *L.Ed.2d* at 752; *Hudgens v. NLRB, supra,* 424 *U.S.* at 519 520, 96 *S.Ct.* at 1036, 47 *L.Ed.2d* at 206–207. Nevertheless, as private property becomes, on a sliding scale, committed either more or less to public use and enjoyment, there is actuated, in effect, a counterbalancing between expressional and property rights. *Marsh v. Alabama, supra,* 326 *U.S.* at 506, 66 *S.Ct.* at 278, 90 *L.Ed.* at 268.

There is a parallel under our State Constitution. The state constitutional equipoise between expressional rights and property rights must be similarly gauged on a scale measuring the nature and extent of the public's use of such property. Thus, even as against the exercise of important rights of speech, assembly, petition and the like, private property itself remains protected under due process standards from untoward interference with or confiscatory restrictions upon its reasonable use. *Robins v. PruneYard Shopping Center, supra,* 23 *Cal.3d* at 910–911, 592 *P.2d* at 347·348, 153 *Cal.Rptr.* at 860 861; see *King v. South Jersey Nat'l Bank, supra,* 66 *N.J.* at 175. The constitutional protection of private property against undue interference or "taking" is secured by our own Constitution. *N.J.Const.* (1947), Art. I, pars. 1 and 20.

On the other hand, it is also clear that private property may be subjected by the state, within constitutional bounds, to reasonable restrictions upon its use in order to serve the public welfare. See, *e. g., Vasquez v. Glassboro Service Ass'n,* 83 *N.J.* 86, 100–101 (1980); *Garrow v. Elizabeth General Hosp. & Dispensary,* 79 *N.J.* 549, 560–561 (1979); *Doe v. Bridgeton Hosp. Ass'n,* 71 *N.J.* 478, 487 488 (1976), *cert.* den., 433 *U.S.* 914, 97

*S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977); *State v. Shack*, 58 *N.J.* 297, 305–308 (1971); *Greisman v. Newcomb Hosp.*, 40 *N.J.* 389, 395–401 (1963); *Zelenka v. Benevolent & Protective Order of Elks*, 129 *N.J.Super.* 379, 386–387 (App.Div.1974), certif. den., 66 *N.J.* 317 (1974); *cf. State v. Miller, supra*, 83 *N.J.* at 415 (1980) (while "preservation of aesthetics and property values is a legitimate end for a municipal zoning ordinance," an ordinance generally prohibiting property owners from placing signs on their property violates the protected First Amendment interests of those property owners). In this regard, the United States Supreme Court has recently acknowledged that

> [i]t is, of course, well–established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation.... [*PruneYard Shopping Center v. Robins, supra*, 447 *U.S.* at 81, 100 *S.Ct.* at 2040–2041, 64 *L.Ed.* 2d at 752.]

The California Supreme Court, in the same case, found that such restrictions upon private property could properly be imposed in order to protect the rights of free speech and petition, *viz*:

> To protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights. [*Robins v. PruneYard Shopping Center, supra*, 23 *Cal.* 3d at 908, 592 *P.*2d at 346, 153 *Cal.Rptr.* at 859.]

We are thus constrained to achieve the optimal balance between the protections to be accorded private property and those to be given to expressional freedoms exercised upon such property. In seeking this optimum, we can derive some guidance from certain of the Supreme Court cases, such as *Marsh v. Alabama, supra; Lloyd Corp. v. Tanner, supra*, and *PruneYard Shopping Center v. Robins, supra*, which recognize generally that the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property. Since it is our State Constitution which we are here expounding, it is also fitting that we look to our own strong traditions which prize the exercise of individual rights and stress the societal obligations that are concomitant to a public enjoyment of private property. See *Vasquez v. Glassboro Service Ass'n, supra*,

83 *N.J.* at 100–101; *State v. Shack, supra,* 58 *N.J.* at 305–308; *Zelenka v. Benevolent & Protective Order of Elks, supra,* 129 *N.J.Super.* at 386-387.

■ Accordingly, we now hold that under the State Constitution, the test to be applied to ascertain the parameters of the rights of speech and assembly upon privately owned property and the extent to which such property reasonably can be restricted to accommodate these rights involves several elements. This standard must take into account (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property. This is a multi faceted test which must be applied to ascertain whether in a given case owners of private property may be required to permit, subject to suitable restrictions, the reasonable exercise by individuals of the constitutional freedoms of speech and assembly.

■ Even when an owner of private property is constitutionally obligated under such a standard to honor speech and assembly rights of others, private property rights themselves must nonetheless be protected. The owner of such private property, therefore, is entitled to fashion reasonable rules to control the mode, opportunity and site for the individual exercise of expressional rights upon his property. It is at this level of analysis—assessing the reasonableness of such restrictions—that weight may be given to whether there exist convenient and feasible alternative means to individuals to engage in substantially the same expressional activity. While the presence of such alternatives will not eliminate the constitutional duty, it may lighten the obligations upon the private property owner to accommodate the expressional rights of others and may also serve to condition the content of any regulations governing the time, place, and manner for the exercise of such expressional rights.

Taken together, these are the relevant considerations which must be brought to bear in order to reach an ultimate determi-

nation in this case as to the constitutionality of Schmid's trespass conviction for attempting to exercise his rights of speech and assembly upon the Princeton University campus. The record in this appeal is to be assessed in light of the constitutional standard herein set forth.

## IV

The application of the appropriate standard in this case must commence with an examination of the primary use of the private property, namely, the campus and facilities of Princeton University. Princeton University itself has furnished the answer to this inquiry in expansively expressing its overriding educational goals, *viz*:

> The central purposes of a University are the pursuit of truth, the discovery of new knowledge through scholarship and research, the teaching and general development of students, and the transmission of knowledge and learning to society at large. Free inquiry and free expression within the academic community are indispensable to the achievement of these goals. The freedom to teach and to learn depends upon the creation of appropriate conditions and opportunities on the campus as a whole as well as in classrooms and lecture halls. All members of the academic community share the responsibility for securing and sustaining the general conditions conducive to this freedom.
>
> . . . . . . . .
>
> Free Speech and peaceable assembly are basic requirements of the University as a center for free inquiry and the search for knowledge and insight. . . . [University Regulations, *supra* (1975 as amended 1976).]

No one questions that Princeton University has honored this grand ideal and has in fact dedicated its facilities and property to achieve the educational goals expounded in this compelling statement.

In examining next the extent and nature of a public invitation to use its property, we note that a public presence within Princeton University is entirely consonant with the University's expressed educational mission. Princeton University, as a private institution of higher education, clearly seeks to encourage both a wide and continuous exchange of opinions and ideas and to foster a policy of openness and freedom with respect to the use of its facilities. The commitment of its property, facilities, and resources to educational purposes contemplates substantial

public involvement and participation in the academic life of the University. The University itself has endorsed the educational value of an open campus and the full exposure of the college community to the "outside world," *i. e.*, the public at large. Princeton University has indeed invited such public uses of its resources in fulfillment of its broader educational ideals and objectives.[10]

The further question is whether the expressional activities undertaken by the defendant in this case are discordant in any sense with both the private and public uses of the campus and facilities of the University. There is nothing in the record to suggest that Schmid was evicted because the purpose of his activities, distributing political literature, offended the University's educational policies. The reasonable and normal inference thus to be extracted from the record in the instant case is that defendant's attempt to disseminate political material was not incompatible with either Princeton University's professed educational goals or the University's overall use of its property for educational purposes.[11] Further, there is no indication that even

---

[10]Princeton University in its regulations has dealt extensively with "[c]ommunity use of University resources." Public participation in activities involving the use of University facilities may be by explicit invitation relating to "activities ... [which] are an integral part of the University's function as an educational institution," by "implicit invitation" as to its grounds and walkways "generally available to the public," by "participation in University-sponsored or sanctioned programs," or by "private invitation" if no other form of invitation is applicable. University Regulations, *supra* note 2 (1975, as amended 1976).

[11]Supportive of this conclusion is the following excerpt from Princeton University President William G. Bowen in "The Role of the University as an Institution in Confronting External Issues" (January 6, 1978):

Central to the philosophy of education is the proposition that the University has a responsibility to expose students and faculty members to a wide variety of views on controversial questions. . . .

Put simply, the University's ability to carry out its basic educational mission requires an environment conducive to the maximum possible freedom of thought and expression for each individual student and faculty member. We are not talking here about something that is merely desirable; we are talking about something that is essential. In this crucial respect, the University has a special role in the society–a special responsi-

under the terms of the University's own regulations, Schmid's activities in any way, directly or demonstrably "disrupt[ed] the regular and essential operations of the University" or that in either the time, the place, or the manner of Schmid's distribution of the political materials, he "significantly infringed on the rights of others" or caused any interference or inconvenience with respect to the normal use of University property and the normal routine and activities of the college community.

Without necessarily endorsing any of the foregoing conclusions, the University nevertheless contends that its solicitation regulation was properly invoked against Schmid in this case because it requires that there be a specific invitation from on–campus organizations or students and a specific official authorization before an individual may enter upon University premises even for the purpose of exercising constitutional rights of speech and assembly. It points out that Schmid failed to obtain such permission. The University stresses the necessity for and reasonableness of such a regulation.

▉ In addressing this argument, we must give substantial deference to the importance of institutional integrity and independence. Private educational institutions perform an essential social function and have a fundamental responsibility to assure the academic and general well being of their communities of students, teachers and related personnel. At a minimum, these needs, implicating academic freedom and development, justify an educational institution in controlling those who seek to enter its domain. The singular need to achieve essential educational goals and regulate activities that impact upon these efforts has

---

bility for creating a milieu in which every individual, whether the steadiest proponent of the majority viewpoint or the loneliest dissenter, is encouraged to think independently.

As noted by Professor Emerson, "freedom of expression is [both] an essential process for advancing knowledge and discovering truth" and "a method of achieving a more adaptable and hence a more stable community, of maintaining the precarious balance between healthy cleavage and necessary consensus." T. Emerson, *The System of Freedom of Expression* 6, 7 (1970).

been acknowledged even with respect to public educational institutions. See, *e. g., Healy v. James, supra,* 408 *U.S.* at 180, 92 *S.Ct.* at 2345, 33 *L.Ed.2d* at 279; *Tinker v. Des Moines Indep. Community School Dist.,* 393 *U.S.* 503, 513 514, 89 *S.Ct.* 733, 740–741, 21 *L.Ed.2d* 731, 741 742 (1969).[12] Hence, private colleges and universities must be accorded a generous measure of autonomy and self - governance if they are to fulfill their paramount role as vehicles of education and enlightenment.

In this case, however, the University regulations that were applied to Schmid (in contrast to those subsequently adopted, *supra* at 539–541 n.2) contained no standards, aside from the requirement for invitation and permission, for governing the actual exercise of expressional freedom. Indeed, there were no standards extant regulating the granting or withholding of such authorization, nor did the regulations deal adequately with the time, place, or manner for individuals to exercise their rights of speech and assembly. Regulations thus devoid of reasonable standards designed to protect both the legitimate interests of the University as an institution of higher education and the individual exercise of expressional freedom cannot constitutionally be invoked to prohibit the otherwise noninjurious and reasonable exercise of such freedoms. *Cf. Tinker v. Des Moines Indep. Community School Dist., supra,* 393 *U.S.* at 513, 89 *S.Ct.* at 740, 21 *L.Ed.2d* at 741 (exercise of right of free speech on public school grounds must not interfere with educational mission of the institution); *Cox v. Louisiana,* 379 *U.S.* 536, 556 -558,

---

[12]The public's right to exercise its freedom of speech does not mandate unrestricted access to university facilities. Even with respect to public property, the public's use of that property for First Amendment activity may be restricted, if not actually prohibited. See, *e. g., Adderley v. Florida,* 385 *U.S.* 39, 47, 87 *S.Ct.* 242, 247, 17 *L.Ed.2d* 149, 155 -156 (1966) (public may be prohibited from demonstrating on the grounds of county jail); *American Future Systems, Inc. v. Pennsylvania State Univ.,* 618 *F.2d* 252, 255 (3 Cir. 1980) (state university regulation forbidding sales demonstrations and solicitation in university–owned and operated residence halls is constitutional); *Wolin v. Port of New York Auth.,* 392 *F.2d* 83, 94 (2 Cir. 1968), *cert.* den., 393 *U.S.* 940, 89 *S.Ct.* 290, 21 *L.Ed.2d* 275 (1968) (regulations may limit public's use of public property for expressional activity to ensure that that activity does not interfere with the use to which the property is dedicated).

85 *S.Ct.* 453, 465–466, 13 *L.Ed.*2d 471, 485 486 (1965) (vague statutes cannot be used to prosecute persons for exercising their First Amendment rights); *Wolin v. Port of New York Auth.,* 392 *F.*2d 83, 93–94 (2 Cir. 1968), *cert.* den., 393 *U.S.* 940, 89 *S.Ct.* 290, 21 *L.Ed.*2d 275 (1968) (public authority may issue reasonable regulations for use of bus terminal for public demonstrations; such regulations should balance right of free expression with public right to use terminal for transportation purposes). In these circumstances, given the absence of adequate reasonable regulations, the required accommodation of Schmid's expressional and associational rights, otherwise reasonably exercised, would not constitute an unconstitutional abridgment of Princeton University's property rights. See *PruneYard Shopping Center v. Robins, supra,* 447 *U.S.* at 82–84, 100 *S.Ct.* at 2041–2042, 64 *L.Ed.*2d at 753 (absent any regulations governing expressional activity, such activity reasonably exercised on private property devoted to public use is protectable under state constitution and does not constitute impermissible infringement upon private property rights). It follows that in the absence of a reasonable regulatory scheme, Princeton University did in fact violate defendant's State constitutional rights of expression in evicting him and securing his arrest for distributing political literature upon its campus.

We are mindful that Princeton University's regulatory policies governing the time, place, and manner for the exercise of constitutionally–protected speech and associational rights have been modified substantially since the events surrounding Schmid's arrest and now more fully and adequately define the nature of these restrictions. As we have indicated, the content of such regulations, recognizing and controlling the right to engage in expressional activities, may be molded by the availability of alternative means of communication. *Supra* at 563–564. These current amended regulations exemplify the approaches open to private educational entities seeking to protect their institutional integrity while at the same time recognizing individual rights of speech and assembly and accommodating the public whose presence nurtures academic inquiry and growth.

As noted, however, these regulations were not in place when the University interfered with Schmid's reasonable efforts to communicate his political views to those present on its campus in April 1978. Hence, Schmid suffered a constitutional impairment of his State constitutional rights of speech and assembly and his conviction for trespass must therefore be undone.

Accordingly, for the reasons set forth, the judgment below is reversed.

PASHMAN, J., concurring and dissenting in part.

I concur in the judgment of the Court and in Parts I, III, IV and V of Justice Handler's opinion for the majority. I do not, however, share the majority's views in Part II of the opinion, which discusses and all but decides whether defendant's conviction for criminal trespass was in violation of the First and Fourteenth Amendments of the United States Constitution. The Court's ruling that the conviction was contrary to Article I, paragraphs 6 and 18 of the New Jersey Constitution renders discussion of the First Amendment unnecessary. Because the majority has nevertheless seen fit to examine in detail the questions arising under the federal Constitution, *see ante* at 542–553, I find the following observations warranted.

The three "shopping center cases" decided by the United States Supreme Court, *Hudgens v. N. L. R. B.*, 424 *U.S.* 507, 96 *S.Ct.* 1029, 47 *L.Ed.*2d 196 (1976); *Lloyd Corp. v. Tanner*, 407 *U.S.* 551, 92 *S.Ct.* 2219, 33 *L.Ed.*2d 131 (1972); *Food Employees Local 590 v. Logan Valley Plaza, Inc.*, 391 *U.S.* 308, 88 *S.Ct.* 1601, 20 *L.Ed.*2d 603 (1968); *see also PruneYard Shopping Center v. Robins*, 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.*2d 741 (1980), and their intellectual predecessor, *Marsh v. Alabama*, 326 *U.S.* 501, 66 *S.Ct.* 276, 90 *L.Ed.* 265 (1946), might appear upon first examination to establish an alternative means of satisfying the Fourteenth Amendment's requirement of "state action." Indeed, in the Supreme Court's most recent discussion of the concept of "state action," *Flagg Bros., Inc. v. Brooks*, 436 *U.S.* 149, 98 *S.Ct.* 1729, 56 *L.Ed.*2d 185 (1978), the Court described these earlier decisions as "[a] second line of cases under the

public–function doctrine," *id.* at 158, 98 *S.Ct.* at 1734 an exception to the requirement of governmental action where private persons exercise powers "traditionally exclusively reserved to the State," *Jackson v. Metropolitan Edison Co.,* 419 *U.S.* 345, 352, 95 *S.Ct.* 449, 454, 42 *L.Ed.2d* 477 (1974). *See Flagg Bros., supra,* 436 *U.S.* at 157–159, 98 *S.Ct.* at 1733. Yet the divergent results in these cases cannot be reconciled merely by examining whether "state action" was present. In each case, the enforcement of trespass laws permitted the private owners of a business district to exclude those who would use the property for speech–related activities. None of the "shopping center cases" rested on the state action doctrine as the ground of decision. These holdings seemed to be concerned with a different question: whether the value of the specific property rights enforced by the state outweighed the harm to the particular First Amendment interest at stake. *See generally* Glennon & Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 *Sup.Ct.Rev.* 221, 232 236. The use of the label "state action" may be misleading, for the focus of attention here has been the presence or absence of a substantive constitutional violation.

This view is confirmed by examining the four cases involving First Amendment protection of expressive activity on private property. In the earliest decision, *Marsh v. Alabama, supra,* Justice Black summarized the Court's reversal of a conviction for criminal trespass upon a privately owned "company town" as follows:

In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and *the enforcement of such restraint by the application of a state statute. In so far as the State has attempted to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town, its action cannot stand.* [326 *U.S.* at 509, 66 *S.Ct.* at 280 (emphasis added)]

While *Marsh* emphasized the assumption of traditional governmental functions by the owners of the "company town," the Court's holding also focused on the government's direct enforcement of the town's restrictive practices by the imposition of

criminal sanctions. The state's decision to protect private property at the expense of expressive activity was constitutionally impermissible. "When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position." *Id.*

These two themes—the presence of direct governmental involvement in the enforcement of private property rights and the balancing of property and First Amendment rights also run through the three "shopping center cases." In *Logan Valley, supra*, the Court described the question presented as "whether Pennsylvania's generally valid rules against trespass to private property can be applied in these circumstances to bar petitioners from the [shopping center] premises." *Logan Valley, supra*, 391 *U.S.* at 315, 88 *S.Ct.* at 1606. The Court answered in the negative and recognized a constitutional right to engage in expressive activity on private property. *Id.* at 325, 88 *S.Ct.* at 1612. None of the dissenting members of the Court—including Justice Black, the author of *Marsh* objected to the result in *Logan Valley* because of an asserted absence of "state action." *See id.* at 327–333, 88 *S.Ct.* at 1613 (Black, J., dissenting); *id.* at 333–337 (Harlan, J., dissenting); *id.* at 337–340, 88 *S.Ct.* at 1618 (White, J., dissenting).

Four years later in *Lloyd Corp., supra*, when the Court "substantially repudiated the rationale of *Logan Valley*," *PruneYard Shopping Center, supra*, 447 *U.S.* at 81, 100 *S.Ct.* at 2040, 64 *L.Ed.*2d at 751, the reason was not the absence of "state action." The Court in *Lloyd Corp.* considered whether the protection of free expression in a shopping center that was unrelated to the center's operations "violates rights of private property protected by the Fifth and Fourteenth Amendments." *Lloyd Corp., supra*, 407 *U.S.* at 553, 92 *S.Ct.* at 2221. The Court recognized the importance of the "state action" requirement under the First and Fourteenth Amendments. *See id.* at 567, 92 *S.Ct.* at 2228. Although it did not address whether the provision of remedies under the trespass laws, which both *Logan Valley* and *Marsh* cited, met that requirement, the Court noted a pronouncement

in *Logan Valley* that implicitly supplied the requisite element of "state action":

> *[T]he State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put.* [*Id.* at 560, 92 *S.Ct.* at 2224 (quoting *Logan Valley, supra,* 391 *U.S.* at 319 320, 88 *S.Ct.* at 1608) (emphasis added)]

Without challenging the soundness of this observation, the Court in *Lloyd Corp.* held "that there ha[d] been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle [the] exercise therein [of] the asserted First Amendment rights." *Lloyd Corp., supra,* 407 *U.S.* at 570, 92 *S.Ct.* at 2229. The majority reached this conclusion after balancing the rights in question:

> It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech. [*Id.* at 567, 92 *S.Ct.* at 2228]

Unlike in *Logan Valley*, therefore, enforcement of property rights imposed no significant burdens on First Amendment rights.

The conflict between *Lloyd Corp.* and *Logan Valley* was resolved by the Court in *Hudgens v. N. L. R. B., supra,* the third of the "shopping center cases." In contending that "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case," *Hudgens, supra,* 424 *U.S.* at 518, 96 *S.Ct.* at 1035, the Court observed generally that the Constitution did not provide protection or redress "against a private corporation or person who seeks to abridge the free expression of others * *." *Id.* at 513, 96 *S.Ct.* at 1033. *Marsh v. Alabama, supra,* was an exception to this principle. *Id.* The *Hudgens* Court found the exception was grounded in the absence of any meaningful distinction between the functions of a company town and a conventional municipality. *Id.* at 514, 96 *S.Ct.* at 1033. The Court did not discuss the significance of the State's use of the trespass laws to enforce the company town's restrictions on speech. However, what is equally important for present purposes is that the Court in *Hudgens* did not reject the function of

criminal trespass laws in supplying "state action." Instead, the Court found *Lloyd Corp.* and *Logan Valley* irreconcilable and therefore held "that under the present state of the law the constitutional guarantee of free expression has no part to play in a case such as this." *Id.* at 521, 96 *S.Ct.* at 1037; *see PruneYard Shopping Center, supra,* 447 *U.S.* at 80–81, 100 *S.Ct.* at 2040, 64 *L.Ed.2d* at 752.

It thus appears that in the development of First Amendment doctrine from *Marsh* through *Hudgens,* the Supreme Court was principally concerned with the reach of substantive constitutional protection for expressive activity, and not with the limits of the "state action" doctrine. Consistent with the approach of these decisions, I would be inclined to rule that the definition of common–law property rights, and their enforcement against defendant through criminal trespass laws, constitute state action. *See New York Times Co. v. Sullivan,* 376 *U.S.* 254, 265, 84 *S.Ct.* 710, 718, 11 *L.Ed.2d* 686 (1964); *Shelley v. Kraemer,* 334 *U.S.* 1, 68 *S.Ct.* 836, 92 *L.Ed.* 1161 (1948); *King v. South Jersey Nat'l Bank,* 66 *N.J.* 161, 180–203, 330 *A.2d* 1 (1974) (Pashman, J., dissenting).

Of course, the presence of state action does not itself spell out a violation of First Amendment rights; it is merely the premise for substantive constitutional inquiry. Because *Logan Valley, Lloyd Corp.* and *Hudgens* focus on the federal Constitution's safeguard of free speech against judicial enforcement of private property rights, the First Amendment issue before us is not whether Princeton University is a "company town," *see Marsh v. Alabama, supra.* Looking instead to *Lloyd Corp.* as the guiding precedent, we would consider whether the value of the university's property rights outweighs the harm to defendant's expressive rights. The crucial factor in this inquiry is whether there has been "such dedication of" Princeton University "to public use as to entitle [the] exercise therein [of] First Amendment rights," *Lloyd Corp., supra,* 407 *U.S.* at 570, 92 *S.Ct.* at 2229. The non–profit, educational, and indeed public purposes of the university would then assume special relevance.

.

In *dictum* wholly unnecessary to the Court's judgment, the majority states that the existence of what it considers to be adequate "alternative means of communication" would deprive defendant of a First Amendment right to engage in expressive activity at the university. *Ante* at 550–551. It relies on *Lloyd Corp.* for its apparent view that the absence of an adequate alternative forum is an absolute prerequisite for federal constitutional protection. Even assuming this to be so, I do not believe the majority has properly addressed whether defendant could adequately deliver his message from public property to students residing on the university campus. A shopping center has no residents; thus a location on public property near an entrance to the center permits full access to its incoming patrons. *See Lloyd Corp., supra,* 407 *U.S.* at 566 567, 92 S.Ct. at 2227. A predominantly residential institution like Princeton University presents different problems of access that are not so easily resolved. *Cf. State v. Shack,* 58 *N.J.* 297, 277 *A.2d* 369 (1971) (ownership of real property does not include the right to bar access to governmental services available to migrant workers residing on the property by invoking the trespass laws). Sites outside the campus or on the fortuitously located public street running through it may not provide an adequate forum for communicating with the residents of the university. The present record describes the location and physical plant of the university but not the traffic patterns of its residents. *See ante* at 551. It can support a judgment about access to lifeless buildings but not one about access to people. Even if the absence of an adequate alternative forum were a crucial requirement, the majority's summary analysis does not warrant the conclusion that defendant receives no protection from the First Amendment.

Furthermore, I would accord less significance to the presence of an adequate alternative forum than does the majority. It is true that in *Lloyd Corp.* the Court distinguished the facts before it from those in *Logan Valley* on two grounds: that the expressive activity was unrelated to the operations of the shopping center, *see Lloyd Corp., supra,* 407 *U.S.* at 564 565, 92 *S.Ct.* at

2226, and that "adequate alternative avenues of communication exist[ed]," *id.* at 567, 92 *S.Ct.* at 2228. But in *Hudgens* the Court repudiated these distinctions as constitutionally insignificant. *See Hudgens, supra,* 424 *U.S.* at 518 519, 96 *S.Ct.* at 1035. The Court expressly rejected any approach to the First Amendment that would resolve rights of free speech within a shopping center by reference to the speech's content. *Id.* at 520, 96 *S.Ct.* at 1036. Addressing the existence of alternative means of communication in *Lloyd Corp.,* the Court noted in *Hudgens* that "the [shopping center] in *Lloyd* more closely resembled the business section in Chickasaw, Ala." the "company town" of *Marsh*–than the center in *Logan Valley. Id.* at 518 n.5, 96 *S.Ct.* at 1035 n.5. The dispositive factor in *Lloyd Corp.* that survived the criticism of *Hudgens* was the absence of "such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents therein the asserted First Amendment rights." *Lloyd Corp., supra,* 407 *U.S.* at 570, 92 *S.Ct.* at 2229. Contrary to the majority, I believe this ruling expresses the primary criterion for determining whether the First Amendment afforded defendant a right to engage in expressive activity on the grounds of the university. This factor is crucial because it determines whether interests in private property outweigh the harm to defendant's right to free speech.

As I have said, there is no need to resolve this issue or to discuss it gratuitously--for we have decided that defendant's conviction for trespass offends the State Constitution. I feel compelled to write only because the majority has expressed what I believe is a restrictive view of the first guarantee in our Bill of Rights. Certainly, the contrast between that view and the Court's State constitutional ruling is difficult to explain. Since I believe the contrast is as unjustified as it is unnecessary, I do not join in Part II of the majority's opinion. I concur, however, in both the judgment of the Court and the balance of my Brother Handler's opinion.

SCHREIBER, J., concurring.

I join in the conclusion reached today by the majority that the judgment of conviction be reversed. However, I am not in

accord with the majority's analysis of the United States Supreme Court's opinions concerning the First Amendment and believe that under its decisions the First Amendment (via the Fourteenth Amendment) has not been violated. Moreover, I would hold that Princeton University's obligation under Article I, par. 6 of the New Jersey Constitution depends upon its dedication to the public of its property.[1]

For Schmid to succeed under the First and Fourteenth Amendments he must establish that the actions taken by Princeton University constituted state action. After discussing several theories and rationales and concluding that their application does not constitute state action, *ante* at 544–549, the majority seems to say that the holding in *Marsh v. Alabama*, 326 *U.S.* 601, 66 *S.Ct.* 276, 90 *L.Ed.* 265 (1966), may justify a finding of state action under the facts in this case. I do not agree. *Marsh v. Alabama* must be considered in the light of three succeeding opinions of the United States Supreme Court, *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 *U.S.* 308, 88 *S.Ct.* 1601, 20 *L.Ed.2d* 603 (1968); *Lloyd Corp. v. Tanner*, 407 *U.S.* 551, 92 *S.Ct.* 2219, 33 *L.Ed.2d* 131 (1972), and *Hudgens v. NLRB*, 424 *U.S.* 507, 96 *S.Ct.* 1029, 47 *L.Ed.2d* 196 (1976).[2]

---

[1] It is not clear whether the majority is relying upon a balancing process, *ante* at 560–561, or is in effect advocating the same principle suggested herein. Compare *ante* at 564–566 with *infra* at 580.

[2] In *Shelley v. Kraemer*, 334 *U.S.* 1, 68 *S.Ct.* 836, 92 *L.Ed.* 1161 (1948), the Supreme Court held that judicial enforcement of a racially restrictive covenant governing a private sale of land constituted state action. Despite ample opportunity to apply the *Shelley* rationale, the Supreme Court has not found that mere prosecution and conviction under a criminal trespass statute furnishes the necessary state action. See *Peterson v. Greenville*, 373 *U.S.* 244, 83 *S.Ct.* 1119, 10 *L.Ed.2d* 323 (1963); *Lombard v. Louisiana*, 373 *U.S.* 267, 83 *S.Ct.* 1122, 10 *L.Ed.2d* 338 (1963); *Robinson v. Florida*, 378 *U.S.* 153, 84 *S.Ct.* 1693, 12 *L.Ed.2d* 771 (1964); *Bell v. Maryland*, 378 *U.S.* 226, 84 *S.Ct.* 1814, 12 *L.Ed.2d* 822 (1964). Moreover, the *Marsh* line of cases did not rely upon enforcement of state trespass statutes. Only Justice Marshall has interpreted these cases to hold that state action existed because of trespass actions. *PruneYard Shopping Center v. Robins*, 447 *U.S.* 74, 89–90, 100 *S.Ct.* 2035, 2045, 64 *L.Ed.2d* 741, 758 (1980) (Marshall, J., concurring). See also *Flagg Brothers, Inc. v. Brooks*, 436 *U.S.* 149, 158–163, 98 *S.Ct.* 1729, 1734, 56 *L.Ed.*

In *Marsh*, the Supreme Court held that the First and Fourteenth Amendments protected the exercise of free speech in a company–owned town which was open to the public generally. The sole distinguishing characteristic of this town was that title to all the property was vested in a private corporation. Justice Black, writing for the majority, reasoned that "[t]he more an owner, for his advantage, opens up his property to use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh v. Alabama*, 326 *U.S.* at 506, 66 *S.Ct.* at 278, 90 *L.Ed.* at 268. He held that people who lived in a municipality were not to be denied freedom of press and religion simply because a private company holds legal title to all the town. Hence, a Jehovah's Witness who distributed religious literature on the "public" sidewalk against the private owner's wishes could not be convicted of criminal trespass.

In *Logan Valley*, the Supreme Court extended the *Marsh* rationale to provide First Amendment protections for union members picketing a store on shopping center property. It held that the shopping center was "the functional equivalent of a 'business block'" and must be treated in substantially the same manner as the business district in a company town. *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 *U.S.* at 325, 88 *S.Ct.* at 1612, 20 *L.Ed.2d* at 616. Significantly, Justice Black, author of the *Marsh* opinion, dissented. He wrote that "*Marsh* was never intended to apply to this kind of situation.

---

2d 185, 195–197 (1978); *Jackson v. Metropolitan Edison Co.*, 419 *U.S.* 345, 352–354, 95 *S.Ct.* 449, 454, 42 *L.Ed.2d* 477, 485–486 (1974).

Logical application of the reasoning in *Shelley* would result in the virtual demise of the limiting aspect of the "state action" concept. Individuals would have to conform their private agreements and activities to constitutional standards "whenever, as almost always, [those] individuals might later seek the security of potential judicial enforcement." *Tribe, American Constitutional Law*, § 18–2 at 1156 (1978). For that reason, its rationale has been considered suspect. See Henkin, "*Shelley v. Kraemer*: Notes for a Revised Opinion," 110 *U.Pa.L.Rev.* 473 (1962); Gilbert, "Theories of State Action as Applied to the 'Sit–In' Cases," 17 *Ark.L.Rev.* 147 (1963); Comment, "The Impact of *Shelley v. Kraemer* on the State Action Concept," 44 *Calif.L.Rev.* 718 (1956); and Comment, 45 *Mich.L.Rev.* 733 (1947).

*Marsh* dealt with the very special situation of a company-·owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes to make a town." *Id.* at 330, 88 *S.Ct.* at 1615, 20 *L.Ed.*2d at 619 (Black, J., dissenting).

Four years later the Supreme Court reconsidered and distinguished *Logan Valley* in *Lloyd Corp. v. Tanner.* The Court held that persons distributing handbills protesting the Vietnam War in a private shopping center were not protected by the First and Fourteenth Amendments and were, therefore, subject to prosecution for criminal trespass. In its opinion the Court described the *Marsh* holding in the following manner: "In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State." *Lloyd Corp. v. Tanner,* 407 *U.S.* at 569, 92 *S.Ct.* at 2229, 33 *L.Ed.*2d at 143. The Court distinguished *Logan Valley* by limiting its application to situations in which two factors exist. First, the expression sought to be protected must be related to the use of the private property. Second, there must be no other reasonable opportunity available to the person claiming protection for conveying his message to his intended audience. *Id.* at 563, 92 *S.Ct.* at 226, 33 *L.Ed.*2d at 140.

In *Hudgens v. NLRB,* the Supreme Court in an opinion by Justice Stewart held that striking warehouse employees did not have a First Amendment right to enter a private shopping center to picket a retail outlet. In determining whether the expression was constitutionally protected, the Court did not apply the two elements discussed in *Lloyd.* Instead, it concluded that despite efforts in *Lloyd* to distinguish *Logan Valley,* "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case." *Hudgens v. NLRB,* 424 *U.S.* at 518, 96 *S.Ct.* at 1036, 47 *L.Ed.*2d at 206. See *PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 78–79, 100 *S.Ct.* 2035, 2039, 64 *L.Ed.*2d 741, 751–752 (1980). Justice Stewart commenced with the premise that the right of free speech is constitutionally guaranteed against abridgment by only the federal or state governments–and that an exception to this truism was *Marsh* ·where the company town was the functional equivalent of a municipal-

ity. He quoted approvingly from Justice Black's dissent in *Logan Valley* that the shopping center was not the equivalent of a town. He concluded that, if the shopping center "is the functional equivalent of a municipality," then constitutional protections of the First and Fourteenth Amendments would apply. 424 *U.S.* at 520, 96 *S.Ct.* at 1036, 47 *L.Ed.2d* at 207.

The rationale advanced in *Hudgens*, relying as it does on *Marsh* and Justice Black's dissent in *Logan Valley*, clearly indicates that the characteristics relied upon in *Lloyd* to distinguish *Logan Valley*, namely, related expression and no alternative access, are not relevant. Since *Hudgens* states that *Logan Valley* was not sound, the reasons given in *Lloyd* to distinguish *Logan Valley* cease to be significant. Thus, the presence of speech related to the particular enterprise and the absence of an adequate alternative to presentation of that speech are not determinants of the existence or nonexistence of state action.

Neither *Lloyd* nor *Hudgens* purports to overrule *Marsh*. In fact, they expressly affirm its rationale. However, these decisions make it clear that *Marsh* is not to be given an expansive reading. Private property must possess all the attributes of or be the equivalent of a state created municipality before it stands in the shoes of the State for First and Fourteenth Amendment purposes. *Lloyd Corp. v. Tanner*, 407 *U.S.* at 569, 92 *S.Ct.* at 2229, 33 *L.Ed.2d* at 143; *Hudgens v. NLRB*, 425 *U.S.* at 513–522, 96 *S.Ct.* at 1033–1037, 47 *L.Ed.2d* at 202–207.

Princeton University is not the functional equivalent of a company town as that term has been construed by the Supreme Court. Its main function is to support an academic community. In doing so, it provides services, such as dormitories, eating facilities, and a security force, which can fairly be classified as "attributes of a state–created municipality." But the present United States Supreme Court decisions require that *all* of the "attributes" be assumed by the private enterprise. *Lloyd Corp. v. Tanner*, 407 *U.S.* at 569, 92 *S.Ct.* at 2229, 33 *L.Ed.2d* at 143. Because of its primary role as an educational institution, Princeton University lacks a number of important attributes which municipalities typically possess. For example, there is no sug-

gestion in the record that Princeton University's campus has either a commercial district, an elementary or secondary school system, a fire department or a sewage disposal plant. Since Princeton University does not fit within the *Marsh* rationale, its efforts to restrain Schmid's distribution of political literature do not constitute state action. Consequently, the criminal prosecution brought to enforce Princeton's legal rights was not in violation of Schmid's First and Fourteenth Amendment rights.

I agree with the majority that Princeton University under the circumstances here is subject to the free speech strictures of the State Constitution.[3] Unlike its counterpart in the Federal Constitution, the New Jersey constitutional guaranty of free speech is not circumscribed by the need to find state action. However, a countervailing precept in the New Jersey Constitution is the owner's right to possess and protect property. *N.J.Const.* (1947), Art. I, par. 1. In harmonizing these seemingly inconsistent rights, it would appear appropriate to subordinate the property owner's rights to the more fundamental concept of the right of free speech when the owner has dedicated its property for a public use involving public discussion.[4] See *Robinson v. Cahill*, 62 *N.J.* 473, 491, 303 *A.2d* 273 (1973), where Chief Justice Weintraub commented that the constitutional right to acquire and hold property is not a likely candidate for preferred treatment as a fundamental right.

An analogous situation may be found in *Doe v. Bridgeton Hospital Ass'n*, 71 *N.J.* 478, 366 *A.2d* 641 (1976), in which a woman's right to an abortion conflicted with a hospital's policy to prevent the use of its property for that purpose. This Court held that the nonsectarian, nonprofit hospital which held out the use of its facilities to the general public assumed quasi -pub-

---

[3]Article I, par. 6 of the New Jersey Constitution (1947) states:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press . . . .

[4]This case is to be distinguished from the exercise by the State of its general police power impacting on private property interests for public good.

lic obligations akin to those assumed by common carriers and innkeepers at common law. Accordingly, the hospital, having the facilities and manpower to perform abortions, could not refuse, on moral grounds, to permit use of its facilities to perform an elective abortion.

The nature and extent of the property owner's holding out or dedication of his property for public use determine what, if any, public function has been undertaken. The scope of the constitutional restraints inherent in that public function may then be ascertained. Obviously there must be a nexus between the purpose of the property owner's dedication and the purpose of the public's use. Thus in *Doe* the holding out of the hospital facility for use in a medical capacity would not justify the exercise of a constitutional right to use the hospital as a political forum. Finally, the public's exercise of its constitutional right is subject to the property owner's regulations governing time, place and manner. The reasonableness of such regulations depends upon many factors including alternative means which the public may have available to exercise that constitutional right.

As the majority indicates, Princeton has made its campus available as a forum for an open and robust exchange of political ideas and opinions by both the Princeton community and the public generally. In fact, the University has acknowledged that this type of public debate lies at the core of its intellectual academic life. Such a commitment of its facilities and property constitutes a holding out of this property for a public use. As such Princeton has assumed a public function. Since Schmid's political expression is consistent with the achievement of Princeton's goals, he is entitled to the protection of the right of free speech guaranteed by the New Jersey Constitution.

Moreover, Princeton University's independence, an element which in many respects is essential in the private academic world, is not thwarted by the State's protection of free speech. It is not a threat to or intrusion upon that independence. Rather, as Justice Handler has cogently pointed out, protection

of the public's right to political speech accords with Princeton's fundamental philosophy of open debate. It is precisely for that reason Princeton is subject to the State's interest.

SCHREIBER, J., concurring in the result.

PASHMAN, J., concurring in part and dissenting in part.

*For reversal* · Chief Justice WILENTZ and Justices SULLI-VAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK· 7.

*For affirmance* None.

