**Olin Jardu CALDWELL, Sr., Plaintiff,**

v.

**KFC CORPORATION, Terry Worley, and Louis Sepe, Defendants.**

**Civil Action No. 96–3163 (JEI).**

United States District Court, D. New Jersey.

March 25, 1997.

---

Jacobs & Barbone by Joseph M. Feeney, Atlantic City, NJ, for Plaintiff.

Ballard, Spahr, Andrews & Ingersoll by Debra E. Kohn, Charisse R. Lillie, Camden, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

Plaintiff instituted this action against his former employer and supervisors seeking damages for sexual harassment, retaliation, wrongful termination, and battery. Defendants now move this Court to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted or, in the alternative, to compel arbitration. Because portions of plaintiff's complaint state claims upon which relief can be granted, this Court will grant in part and deny in part defendants' motion to dismiss. Because plaintiff's claims fall outside the substantive scope of the arbitration agreement, the Court will

deny defendants' alternative motion to compel arbitration.

## I. BACKGROUND

On April 28, 1994, plaintiff applied for a job as a fry cook with defendant KFC Corporation ("KFC") at its Somers Point, New Jersey fast-food restaurant. He signed an employment application which included an arbitration agreement:

[I]f I am offered employment and accept, KFC and I agree to submit to binding arbitration any claims concerning the termination of my employment. I also agree, before this arbitration process is used: (i) first, to present any such claims in written detail to the KFC Human Resources Department; (ii) next, to pursue to completion any KFC internal review process; and (iii) finally to file and pursue to completion any external administrative remedy (such as with the Equal Opportunity Employment Commission). In any such arbitration, the then prevailing rules of the American Arbitration Association (and, to the extent not inconsistent, the then prevailing rules of the Federal Arbitration Act) shall apply.

Plaintiff's Ex. B. KFC hired plaintiff for the position of fry cook that same day, and he soon began employment under the supervision of defendant Terry Worley, plaintiff's shift manager, and defendant Louis Sepe, the manager of the Somers Point KFC restaurant.

According to plaintiff's complaint, Mr. Worley, an admitted homosexual, sexually harassed him on the job over the next few months. On May 29, 1994, Mr. Worley reportedly made sexually explicit remarks, within plaintiff's earshot, to the effect that he wished to have sexual relations with plaintiff. *See* Complaint ¶ 11. Mr. Worley also reportedly made remarks degrading plaintiff's masculinity. *See id.* On June 17, 1994, Mr. Worley allegedly made a sexual advance to-

wards plaintiff, offensively touching plaintiff's buttocks. *See id.* ¶ 12. Plaintiff consistently rejected Mr. Worley's advances and informed him that he wished that this behavior stop. *See id.* ¶ 13. The next day, plaintiff reportedly complained of Mr. Worley's behavior to Mr. Sepe. *See id.* ¶ 14.

The following week, plaintiff alleges that Mr. Worley became openly hostile towards him. On one occasion, Mr. Worley allegedly prevented plaintiff from clocking in and working at his designated starting time. *See id.* ¶ 15. Plaintiff alleges that he reported this incident to Mr. Sepe and sought to be switched to a different shift or in the alternative transferred to a different KFC location. *See id.* ¶ 16. Mr. Sepe pursued neither remedy at that time.

On July 9, 1994, Mr. Worley reportedly reprimanded plaintiff for poor work performance without justification. *See id.* ¶ 17. Plaintiff asserts that the true motivation underlying this reprimand was Mr. Worley's anger and bitterness towards plaintiff for rejecting his sexual advances and complaining to Mr. Sepe about his behavior. *See id.* Mr. Worley then allegedly threatened plaintiff that he would be fired if he made any more allegations of sexual harassment. *See id.* ¶ 18. Plaintiff reportedly then informed Mr. Worley that he had already complained to the New Jersey Division of Civil Rights. *See id.* ¶ 18. Mr. Worley then fired plaintiff, allegedly telling him to "[g]et the f*** out of" the store and invoking racial slurs. *See id.*

Plaintiff entered a verbal complaint with the New Jersey Division of Civil Rights on June 25, 1994, and formalized it in writing on July 18, 1994. *See id.* ¶ 23. On July 29, 1996, the Equal Employment Opportunity Commission ("EEOC") issued plaintiff a "right to sue" letter, terminating its process with respect to plaintiff's complaint. *See* Defendants' Reply Ex. A. Twenty days earlier,[1] plaintiff instituted this action in federal court asserting claims under Title VII of the

---

**1.** Plaintiff's complaint inaccurately charges that as of the date of its filing, July 9, 1996, plaintiff had received his "right to sue" letter. *See* Complaint ¶ 23. In fact, plaintiff's right to sue letter is dated July 29, 1996. *See* Defendants' Reply Ex. A. While defendants' reply deems this discrepancy a procedural defect in plaintiff's suit,

the Third Circuit has considered it otherwise, so long as plaintiff amends his complaint validating it. *See Gooding v. Warner–Lambert Co.*, 744 F.2d 354, 359 & n. 5 (3d Cir.1984) (considering issuance of a right to sue letter after a Title VII suit has been filed of little consequence).

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17, the New Jersey Law Against Discrimination ("N.J.L.A.D."), N.J.S.A. §§ 10:5–1 to 10:5–42, and common-law wrongful termination and battery. Plaintiff now seeks to amend his complaint to add a civil rights claim under the New Jersey Constitution, *see* N.J. Const. art. 1, ¶ 5 (state equal protection clause), and to correct KFC's corporate name.

## II. LEAVE TO AMEND

In his opposition papers to defendants' 12(b)(6) motion, plaintiff expresses a desire to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a) to add a civil rights claim under the New Jersey Constitution, and to correct KFC's corporate name. As plaintiff's time to amend his pleading as a matter of course has expired, he seeks to amend by leave of court. *See* Fed.R.Civ.P. 15(a).

■■■ Rule 15(a) states that leave to amend "shall be freely given" and, while a court has discretion to deny leave, that discretion is circumscribed by the liberal amendment philosophy behind the rule. Fed.R.Civ.P. 15(a); *see also Snyder v. Baumecker,* 708 F.Supp. 1451, 1456 (D.N.J.1989). Indeed, a plaintiff seeking to amend ought to be afforded an opportunity to test his claim on the merits, if the underlying facts and circumstances may be a proper subject for relief. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1484 (2d ed. 1990). Accordingly, leave to amend ought be denied only in exceptional circumstances, for example, where a movant has unduly delayed matters, where a movant has acted in bad faith or with a dilatory motive, where the amendment would unduly prejudice other parties to an action, or where the amendment would prove futile. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230 (listing reasons to deny leave); *Riley v. Taylor,* 62 F.3d 86, 90 (3d Cir.1995); 6 Wright, *supra,* § 1487.

■■■ Under the New Jersey Constitution, as under the federal constitution, a plaintiff may only assert an equal protection violation against a state actor. *See Robinson v. Cahill,* 62 N.J. 473, 491–92, 303 A.2d 273, 282 (1973); *see also State v. Schmid,* 84 N.J. 535, 559–60, 423 A.2d 615, 628 (1980) (noting that the New Jersey Constitution has a different standard for state action than does the federal Constitution). KFC, a private purveyor of fried and roasted chicken, fails to qualify as a state actor under either the state or the federal standard. *See Schmid,* 84 N.J. at 562–63, 423 A.2d at 629–30; *see also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). Thus, plaintiff's proposed state civil-rights amendment would be futile under New Jersey law. Accordingly, the Court will deny him leave to amend his complaint to add a state constitutional claim. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Riley,* 62 F.3d at 90; *Oquendo v. Bettcher Indus., Inc.,* 939 F.Supp. 357, 360 (D.N.J.1996). The Court will, however, grant plaintiff leave to amend his complaint to correct KFC's corporate name and to reflect that he has, since the filing of his original complaint, received a right to sue letter. *See supra* note 1.

## III. MOTION TO DISMISS

### A. *Applicable Standard*

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, a court will accept the allegations of the complaint as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of Calif., Inc., v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). Finally, when "[c]onfronted with [a 12(b)(6)] mo-

tion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

### B. *Employer Liability*

#### 1. Title VII

■ Plaintiff's complaint sets forth two causes of action under Title VII: one for same-sex sexual harassment, and one for retaliation. Defendants seek to dismiss the first of these for failure to state a claim upon which relief can be granted, arguing that same-sex sexual harassment is not cognizable under Title VII. Because defendants make no argument to dismiss plaintiff's retaliation claim, and because that claim is viable under this District's caselaw, *see Weiss v. Parker Hannifin Corp.,* 747 F.Supp. 1118, 1128–29 (D.N.J.1990) (setting forth the prima facie case for retaliatory discharge, which plaintiff meets), this Court need only address plaintiff's same-sex sexual harassment claim.

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that Title VII's ban on sex discrimination includes two types of sexual harassment: "quid pro quo" harassment, whereby sexual conduct is linked to the grant or denial of economic incentives, and "hostile work environment" harassment, whereby the conduct complained of "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R.

§ 1604.11(a)(3)). Accordingly, "when a supervisor harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404. Accepting as true the allegations in plaintiff's complaint, there is no doubt that the complaint would state a sexual harassment claim if plaintiff and Mr. Worley were not of the same gender.[2]

Neither the Third Circuit Court of Appeals nor the District of New Jersey has addressed whether same-sex sexual harassment constitutes a cognizable claim under Title VII, although the Eastern District of Pennsylvania has consistently concluded that it does. *See Wiley v. Burger King,* No. 96–4859, 1996 WL 648455 (E.D.Pa. Nov. 7, 1996) (VanArtsdalen, J.); *Ward v. Ridley Sch. Dist.,* 940 F.Supp. 810 (E.D.Pa.1996) (Kelly, J.); *Swage v. The Inn Philadelphia,* No. 96–2380, 1996 WL 368316 (E.D.Pa. June 21, 1996) (Shapiro, J.); *King v. M.R. Brown, Inc.,* 911 F.Supp. 161 (E.D.Pa.1995) (Newcomer, J.). Several circuit courts of appeals have reached the same conclusion, *see Yeary,* 107 F.3d at 448; *Wrightson v. Pizza Hut of America, Inc.,* 99 F.3d 138 (4th Cir.1996) (finding same-sex sexual harassment actionable only when the harasser is homosexual); *Quick v. Donaldson,* 90 F.3d 1372 (8th Cir.1996), and several more have indicated a willingness to so conclude. *See McDonnell v. Cisneros,* 84 F.3d 256, 260 (7th Cir.1996); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir. 1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 148 (2d Cir.1993) (Van Graafeiland, J., concurring), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Morgan v. Massachusetts Gen. Hosp.,* 901 F.2d 186, 192–93 (1st Cir.1990); *Barnes v. Costle,* 561 F.2d 983, 990 n. 55 (D.C.Cir.1977). *But see Oncale v. Sundowner Offshore Svcs., Inc.,* 83

---

2. The facts of this case do not suggest that plaintiff suffered sexual harassment at the hands of Mr. Worley because of plaintiff's sexual orientation, a mental disability, or a prudish demeanor. Such actions, it is clear, would not be actionable under Title VII. *See, e.g., Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 751 (4th Cir.1996) (holding sexual-orientation discrimination outside the scope of Title VII). Rather, plaintiff presents what can be described as a traditional

sexual harassment case, albeit "with a twist." *Yeary v. Goodwill Indus.–Knoxville, Inc.,* 107 F.3d 443, 447–48 (6th Cir.1997). Plaintiff alleges that his immediate superior made sexual propositions to him and physically assaulted him because his superior finds him sexually attractive. This scenario, where the aggressor and the victim are of different genders, has been found actionable "countless times over." *Id.*

F.3d 118, 120 (5th Cir.1996), *petition for cert. filed,* 54 U.S.L.W. 3432 (U.S. Dec. 16, 1996) (No. 96–568).[3] While this Court is not bound by these decisions, it finds their reasoning persuasive.

First, nothing in the Civil Rights Act suggests that Congress intended Title VII's protections to apply only to persons who are harassed by members of the opposite sex. Indeed, there is no legislative history on the meaning of "sex discrimination." *See Meritor,* 477 U.S. at 63–64, 106 S.Ct. at 2403–04 (noting that the prohibition on sex discrimination was added at the last minute without much debate). The EEOC, the agency charged with enforcing federal anti-discrimination laws, unequivocally states that Title VII protects employees from same-sex discrimination:

> The victim does not have to be of the opposite sex of the harasser. Since sexual harassment is a form of sexual discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. . . .
>
> *Example 1*—If a male supervisor of male and female employees makes unwelcome sexual advances toward a male employee because the employee is male but does not make similar advances toward female employees, then the male supervisor's conduct may constitute sexual harassment since the disparate treatment is based on the male employee's sex.

2 EEOC Compliance Manual § 615.2(b)(3) (1974 & Supp.1996); *see also* EEOC Decision No. 81–16, 1981 WL 40387, at *2 ("In this case, Charging Party alleges that his supervisor, a male, made unwanted sexual advances toward him. As a result of rejecting those advances, Charging Party claims, he

was laid off. If such an allegation is true, then it is a violation of Title VII . . . ."). This interpretation, while not binding on this Court, represents "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).

Second, Congress's use of the unmodified word "sex"—and the unmodified words "race" and "religion"—has resulted in an expansive reading of Title VII. For example, Title VII applies to racial or sexual discrimination against whites or against men, *see Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 71–72, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113 (1977) (applying Title VII "regardless of whether the discrimination is directed against majorities or minorities"); *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 967 (3d Cir.1978) (applying Title VII "on the same terms to discrimination against males or whites as . . . to discrimination against women or racial and ethnic minorities"), as well as to sexual harassment perpetrated by women against men. *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06; *Tomkins v. PSE & G,* 568 F.2d 1044, 1047 n. 4 (3d Cir.1977) ("Title VII prohibits discrimination against men as well as women."). Thus, the principles of current Title VII jurisprudence strongly suggest that there is a cause of action for same-sex sexual harassment. *See King,* 911 F.Supp. at 161 (thinking it nonsensical " 'to allow reverse discrimination cases but not same-sex sexual harassment cases to proceed under Title VII' " (quoting *EEOC v. Walden Book Co.,* 885 F.Supp. 1100, 1103 (M.D.Tenn.1995))); *see also Swage,* 1996 WL 368316, at *3. *But see Goluszek v. Smith,*

---

**3.** In *Oncale,* the Fifth Circuit Court of Appeals reaffirmed prior circuit decisions holding that Title VII does not recognize a cause of action for same-sex sexual harassment. *See Oncale,* 83 F.3d at 119–20 (citing *Giddens v. Shell Oil Co.,* No. 92–8533, 12 F.3d 208 (5th Cir. Dec. 6, 1993) (per curiam) and *Garcia v. Elf Atochem North America,* 28 F.3d 446 (5th Cir.1994)). *Giddens,* an unpublished decision, appears to have held that same-sex sexual harassment is not actionable under Title VII without a showing that the harassee was treated differently or harassed be-

cause of his or her sex—hardly a controversial proposition. *See Oncale,* 83 F.3d at 119–20 (describing *Giddens* ); *cf. Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404. With little analysis, *Garcia* read *Giddens* to bar all same-sex sexual harassment suits. *See Garcia,* 28 F.3d at 451–52. Bound by *Garcia,* the *Oncale* panel did not address the merits of the Title VII issue. Instead, in what can only be described as a lukewarm endorsement, the *Oncale* panel reaffirmed that *Garcia* is the law of the Fifth Circuit. *See Oncale,* 83 F.3d at 120.

697 F.Supp. 1452, 1456 (N.D.Ill.1988) (holding that Title VII does not recognize same-sex sexual harassment, reasoning that Title VII's sole purpose is to foster equal employment opportunities for "discrete and vulnerable group[s]" (citing Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv.L.Rev. 1449, 1451–52 (1984) but no legislative history)).

Third, an absolutist approach that same-sex sexual harassment is never actionable would effectively "exempt homosexuals from the very laws that govern the workplace conduct of heterosexuals." *Pritchett v. Sizeler Real Estate Management Co.*, No. 93–2351, 1995 WL 241855, at *2 (E.D.La. Apr. 25, 1995). Thus, ironically, a homosexual supervisor could sexually harass his or her subordinates with impunity while a heterosexual supervisor would create Title VII liability for the very same conduct. *See id.* (exploring this irony). This Court will not advance an interpretation of Title VII that produces such incongruous results.[4]

Accordingly, this Court holds that plaintiff's claim of same-sex sexual harassment is cognizable under Title VII. Like any other sexual-harassment plaintiff, plaintiff must still prove that the sexual harassment he suffered was "because of his sex"—that had he been a woman, he would not have been subjected to Mr. Worley's sexual harassment. *See Tomkins*, 568 F.2d at 1047 n. 4 (requiring a female plaintiff to show that if she "had been a man she would not have been treated in the same manner"). Because plaintiff's complaint contains this allegation, *see* Complaint ¶ 21, and for the purposes of this motion this Court must accept plaintiff's allegations as true, plaintiff's same-sex sexual harassment claim must survive defendants' motion to dismiss.

To be sure, same-sex sexual harassment claims potentially present difficult questions. For example, where the victim of sexual harassment is a homosexual and the harasser is not, it may be unclear whether he has been harassed "because of" his sex, "because of" his sexual orientation, or a combination of the two. *See generally Wrightson*, 99 F.3d at 144 (discussing the "because of" causation requirement is sexual harassment cases). Similarly, where a heterosexual supervisor is particularly puerile or perverted, it may be unclear whether a plaintiff has been harassed "because of" his sex or whether he has suffered "because of" his supervisor's vulgarity, insensitivity, or meanness of spirit. *See generally McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir.) (discussing issues raised by same-sex sexual harassment cases where the alleged harasser is heterosexual), *cert. denied*, —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996). Fortunately, this case does not now present these difficult issues for this Court's determination. *See supra* note 2. Rather, the Court need only decide that plaintiff's complaint alleging same-sex sexual harassment by his homosexual supervisor states a claim under Title VII upon which relief can be granted. The Court will deny defendants' motion to dismiss plaintiff's Title VII claims accordingly.

### 2. N.J.L.A.D.

■ Defendants also seek to dismiss plaintiff's N.J.L.A.D. claim for failure to state a claim upon which relief can be granted, arguing that same-sex sexual harassment is not cognizable under the N.J.L.A.D. Because defendants make no argument to dismiss plaintiff's N.J.L.A.D. retaliation claim, and because that claim is viable under New Jersey law, *see* N.J.S.A. 10:5–12(d); *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863–67 (3d Cir.1990) (setting forth the prima facie case for retaliatory discharge under the N.J.L.A.D., which plaintiff meets), this Court need only address plaintiff's N.J.L.A.D. same-sex sexual harassment claim.

---

4. *But see Vinson v. Taylor*, 753 F.2d 141, 145 n. 7 (D.C.Cir.1985) (Bork, Scalia, and Starr, JJ., dissenting) (suggesting that Title VII would not apply to a bisexual who harasses members of both sexes equally: "only the differentiating libido runs afoul of Title VII"), *aff'd sub nom. Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Bundy v. Jackson*, 641 F.2d 934, 942 n. 7 (D.C.Cir.1981) (same); *Barnes v. Costle*, 561 F.2d 983, 991 n. 55 (D.C.Cir.1977) (same); *see also* Douglas S. Miller, *Rumpole and the Equal Opportunity Harasser (or Judge Bork's Revenge)*, 20 J. Legal Prof. 165, 169 (1996) (quoting Rumpole's defense of a bisexual sexual harasser, "One might say that he loved not wisely, but too widely").

Defendants represent to the Court that New Jersey courts have yet to address the issue, and suggest that the Court look for guidance to Title VII jurisprudence—specifically that of the Fifth Circuit Court of Appeals. However, this Court need not look so far. In *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993), the Supreme Court of New Jersey specifically answered the question here presented. Interpreting the N.J.L.A.D., the unanimous Court wrote:

> [T]he [hostile work environment] standard we announce today applies to sexual harassment of women by men, men by women, men by men, and women by women. The L.A.D. protects both men and women and bars both heterosexual and homosexual harassment.

*Id.* at 604, 626 A.2d at 454. In light of this explicit statement, it is clear that the New Jersey Supreme Court interprets N.J.L.A.D. to include a cause of action for same-sex sexual harassment. Accordingly, this Court will deny defendants' motion to dismiss plaintiff's N.J.L.A.D. claims, as well.

### 3. Battery

 Defendants seek to dismiss plaintiff's battery claim, arguing first that the N.J.L.A.D. has supplanted that common-law cause of action, and second that KFC cannot be held liable for its employee's intentional torts. As New Jersey courts have routinely entertained offensive-touching battery claims alongside hostile work environment sexual harassment claims, defendants' first contention is without merit. *See, e.g., Wilson v. Parisi*, 268 N.J.Super. 213, 219, 633 A.2d 113, 115 (App.Div.1993) (citing cases). Defendants' second argument, however, prevails.

 Common-law battery is an intentional tort involving the harmful or offensive touching of plaintiff's person without his consent. *See id.; see also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 9 (5th ed. 1984). Plaintiff seeks to hold KFC vicariously liable by virtue of its employment relationship with Mr. Worley. However, under vicarious liability principles, an employer may be held vicariously liable for an employee's intentional torts only insofar as those torts fall within the scope of the employee's employment. *See Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 419, 650 A.2d 958, 965 (1994) (quoting 53 Am.Jur.2d *Master & Servant* § 438 (1970)). Thus, as a threshold matter, plaintiff must demonstrate that Mr. Worley's offensive touching of plaintiff's buttocks was "reasonably connected with [his] employment and so within its 'scope.'" *Id.* (quoting William L. Prosser, *Cases and Materials on Torts* 685 (7th ed. 1982)).

This plaintiff cannot do. Offensive touching is not the kind of work KFC employed Mr. Worley to perform. Mr. Worley's conduct was not in any way designed to serve a business purpose of KFC. *Cf.* Keeton et al., *supra*, § 9, at 505–06 (discussing vicarious liability for the intentional torts of security guards and bouncers). The tort was not something to be expected to arise out of Mr. Worley's employment as a shift supervisor. *Cf. id.* (concerning security guards and bouncers). Indeed, nothing in the record suggests that Mr. Worley's conduct was anything other than an individual wrong motivated by personal reasons. Accordingly, KFC may not be held vicariously liable for Mr. Worley's alleged battery. This Court will thus grant defendants' motion to dismiss plaintiff's battery claim against KFC for failure to state a claim upon which relief can be granted.

### 4. Wrongful Termination

 Defendants seek to dismiss plaintiff's common-law wrongful-termination claim, arguing that the N.J.L.A.D. has supplanted that cause of action. Indeed, in *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 569 A.2d 793 (1990), the Supreme Court of New Jersey considered the N.J.L.A.D. to so preclude a common-law wrongful-termination claim. "[I]f the L.A.D. creates a remedy, 'it might be unnecessary to recognize or create a [wrongful-termination] action to vindicate substantially the same rights and provide similar relief.'" *Id.* at 562, 569 A.2d at 804; *see also Butler v. Sherman, Silverstein & Kohl*, 755 F.Supp. 1259, 1265 (D.N.J.1990) (interpreting *Erickson* to preclude a common-law wrongful-termination claim where the N.J.L.A.D. provides a remedy for the

wrong). The Court will grant defendants' motion to dismiss plaintiff's common-law wrongful-termination claim against KFC for failure to state a claim upon which relief can be granted.

## C. Individual Liability

### 1. Title VII

■ Defendants move to dismiss plaintiff's Title VII claims against Messrs. Worley and Sepe, arguing that Title VII does not provide for individual liability for employees. In *Dici v. Pennsylvania,* 91 F.3d 542 (3d Cir.1996), the Third Circuit so concluded, joining the "great weight of authority" from other circuits to hold that "individual employees cannot be held liable under Title VII." *Id.* at 552. In his opposition to defendants' motion papers, plaintiff concedes that *Dici* dictates the dismissal of Title VII claims against individual defendants. The Court will therefore dismiss plaintiff's Title VII claims against Messrs. Worley and Sepe.

### 2. N.J.L.A.D.

■ Unlike Title VII, the N.J.L.A.D. provides for individual liability for certain employees in certain situations. *See Tyson v. CIGNA Corp.,* 918 F.Supp. 836 (D.N.J. 1996). Specifically, the N.J.L.A.D. "imposes liability on supervisory employees only to the extent that the supervisory employee affirmatively engages in discriminatory conduct while acting in the scope of employment." *Id.* at 837. Thus, "a supervisory employee's omissions, acquiescence, passivity or other failure to act" are insufficient to establish individual liability. *Id.* at 837. As Messrs. Worley and Sepe both worked for KFC as plaintiff's supervisors, this Court must address the level of each's affirmative engagement in the alleged sexual harassment of plaintiff.

Plaintiff's complaint merely alleges that Mr. Sepe knew of the alleged sexual harassment but did nothing to remedy the situation. *See* Complaint ¶¶ 16, 21. As *Tyson* makes clear, these facts without more do not rise to the level of affirmative engagement required for individual liability. *See Tyson,* 918 F.Supp. at 841 (holding that "[m]ere

inaction, passivity, or acquiescence" fall short of the "willfulness, intent, or commonality of goals" required for N.J.L.A.D. "individual liability"). Accordingly, the Court will grant defendants' motion to dismiss plaintiff's N.J.L.A.D. claim against Mr. Sepe in his individual capacity for failure to state a claim upon which relief can be granted.

■ As for Mr. Worley, plaintiff's complaint alleges sufficient affirmative conduct to satisfy that portion of the *Tyson* standard for individual liability. *See* Complaint ¶¶ 11–18. Although the offensive touching itself was not in the scope of his employment, much of Mr. Worley's alleged conduct either was in the scope of employment or cloaked with the mantle of his authority as plaintiff's supervisor. *See Tyson,* 918 F.Supp. at 837, 842. He propositioned plaintiff on the job, manipulated his work schedule, reprimanded him supposedly for no reason, and ultimately fired him for making sexual harassment complaints to the New Jersey Division of Civil Rights. *See Lehmann,* 132 N.J. at 619, 626 A.2d at 461–62 (citing agency principles to determine scope of employment); Keeton et al., *supra,* § 70, at 502 (same). Accordingly, the Court will deny defendants' motion to dismiss plaintiff's N.J.L.A.D. claim against Mr. Worley in his individual capacity for failure to state a claim upon which relief can be granted.

### 3. Battery

Defendants seek to dismiss plaintiff's battery claim against Mr. Worley, arguing that the N.J.L.A.D. has supplanted that common-law cause of action. For the reasons set forth above in part III.B.3, this Court rejects defendants' argument. Because plaintiff's complaint states a cause of action for common-law battery, and because that claim is viable despite the passage of the N.J.L.A.D., this Court will deny defendants' motion to dismiss plaintiff's battery claim against Mr. Worley for failure to state a claim upon which relief can be granted.

### 4. Wrongful Termination

Defendants seek to dismiss plaintiff's wrongful-termination claim against Messrs. Worley and Sepe, arguing that the

N.J.L.A.D. has supplanted that common-law cause of action. For the reasons set forth above in part III.B.4, this Court accepts defendants' argument. The Court will thus grant defendants' motion to dismiss plaintiff's common-law wrongful-termination claim against Messrs. Worley and Sepe for failure to state a claim upon which relief can be granted.

## IV. ARBITRATION

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, "a written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Plaintiff does not dispute that the arbitration agreement contained in his employment application is one "involving commerce" within the meaning of the FAA. *See* 9 U.S.C. § 1; *see also Crawford v. West Jersey Health Sys.*, 847 F.Supp. 1232, 1240 (D.N.J.1994) (requiring only the "slightest nexus with interstate commerce"). Nonetheless, he contends the arbitration agreement ought not be enforced because his instant claims are outside the arbitration clause's scope.

As a preliminary matter, this Court notes the unclear scope of the FAA. On its face, the FAA seems to exclude employment contracts from its purview: "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court explicitly declined to decide whether this language excludes from coverage all contracts of employment. *See id.* at 25 n. 2, 111 S.Ct. at 1651 n. 2. Most courts addressing the issue have read this language very narrowly, applying it only to seamen, railroad workers, and other workers personally engaged in moving goods through inter-

state commerce, *see, e.g., Rojas v. TK Communications, Inc.*, 87 F.3d 745, 747–48 (5th Cir.1996); *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 601 (6th Cir.1995); *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir.1972); *Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir.1971); *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers*, 207 F.2d 450, 453 (3d Cir.1953), although the Third, Sixth, and Ninth Circuits have in dicta cast some doubt on this interpretation. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1112 n. 1, 1119–20 (3d Cir.1993); *Mago v. Shearson Lehman Hutton, Inc.*, 956 F.2d 932, 934 (9th Cir. 1992); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 310–11 (6th Cir.1991) (explicitly adopting a broad reading of § 1);[5] *see also Gilmer*, 500 U.S. at 36–43, 111 S.Ct. at 1657–61 (Stevens and Marshall, JJ., dissenting). Because, at least in the Third Circuit, the scope of the FAA remains an open issue, this Court chooses to avoid the question and instead rest its arbitrability decision on other grounds.

 Unlike some arbitration clauses (indeed, unlike some KFC arbitration clauses), the arbitration clause plaintiff signed does not purport to encompass all employment-related disputes. *Cf. Brown v. KFC Nat'l Management Co.*, 82 Hawai'i 226, 230, 921 P.2d 146, 150 (1996) (quoting a more expansive KFC arbitration clause, referring to arbitration "any controversies concerning [an employee's] compensation, employment or termination of employment"). Rather, it covers only those "claims concerning the termination of [plaintiff's] employment." Plaintiff's Ex. B. Thus, by its terms, the instant arbitration clause excludes a host of potential employment disputes: claims for equal or higher pay, disability, or health benefits; claims regarding promotions and demotions; claims to improve workplace safety; and claims to ameliorate work conditions and

---

5. Because *Willis* panel's broad interpretation of § 1 appeared in dicta, the later *Asplundh* panel was not bound to follow it and ultimately construed the statute narrowly. *See Asplundh*, 71 F.3d at 596–602.

workplace harassment.[6] Clearly, plaintiff's battery and sexual harassment claims do not concern the termination of his employment— following the battery and despite the harassment, plaintiff continued to work at KFC until fired. Thus, the Court holds that these claims clearly fall outside the substantive scope of the arbitration clause.

■■■ Plaintiff's retaliation claims present a closer question, as the retaliation allegedly inflicted on plaintiff consisted of his firing. *See* Complaint ¶ 18. The arbitration agreement, purporting to encompass "any claims concerning the termination of [one's] employment," is not a model of clarity or precision. A person unversed in the law and unfamiliar with contracts might read the agreement to cover only those claims that flow from his work relationship with KFC: claims for severance pay, vacation pay, or disability, claims disputing the grounds on which he might be terminated, and the like. Such a person might not consider this language to include claims arising from statutory civil rights violations. To a layman these sorts of civil rights actions might be thought to flow not from one's work relationship but rather from federal and state laws. Although there is a reference in the arbitration clause to the EEOC in the context of completing "any external administrative remedy," to an average layman this reference confuses as much as clarifies the meaning of the entire paragraph.

■■■ Interpreting the parties' arbitration agreement involves competing principles of contractual interpretation. Generally, in determining the scope of an arbitration clause, courts operate under a "presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT & T Techs. v. Communications Workers*, 475 U.S.

643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). Of course, where an agreement to arbitrate is limited in its substantive scope, courts ought not allow this "'policy favoring arbitration ... to override the will of the parties by giving the arbitration clause greater coverage than the parties intended.'" *Paine-Webber v. Hartmann*, 921 F.2d 507, 513 (3d Cir.1990) (quoting *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760–61 (D.C.Cir.1988)); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (deeming arbitration "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration").

■■■ Cutting against this federal policy favoring arbitration are two state-law principles of contract interpretation. Although the FAA governs the enforcement of arbitration agreements affecting commerce and "preempts state law which treats arbitration agreements differently from any other contracts, it also preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional*, 991 F.2d 42, 45–46 (2d Cir.1993); *see also Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (dictating that state law determines whether parties have agreed to arbitrate). Thus, state-law and common-law principles of contract interpretation properly guide this Court in construing the parties' agreement.

■■■ Courts have long applied the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212,

---

**6.** While harassment claims can involve one's termination, *see Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887–88 (3d Cir.1984) (constructive discharge), they often do not. For example, like Mr. Caldwell, Sgt. Hurley and Mr. Tyson continued to work for their respective defendant-employers after suffering alleged harassment. *See Hurley v. Atlantic City Police Dep't*, 933 F.Supp. 396, 401 (D.N.J.1996) (sexual harassment); *Tyson*, 918 F.Supp. at 837–38 (alleged racial harassment).

1219, 131 L.Ed.2d 76 (1995); *see also In re Miller,* 90 N.J. 210, 221, 447 A.2d 549, 555 (1982); Restatement (Second) of Contracts § 206 (1979). Particularly where, as here, a drafter could have easily drafted a more precise document, a court ought not later reward him with a favorable, expansive interpretation. *See Doto v. Russo,* 140 N.J. 544, 557, 659 A.2d 1371, 1377 (1995) (considering more precise, alternate language in interpreting a vaguely drafted contract). Indeed, by naming civil rights statutes, either generally or by name, KFC could have placed the coverage of the arbitration clause safely beyond reasonable question and at the same time given job applicants meaningful notice that civil rights claims they might have against their future employer could not be brought in a court of law before a jury. *Cf. Johnson v. Hubbard Broadcasting, Inc.,* 940 F.Supp. 1447, 1449 (D.Minn.1996) (quoting an arbitration clause covering "all disputes governed by the Employee Retirement Income Security Act, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and all state and local anti-discrimination laws and ordinances").

A third principle of contractual interpretation applicable to this case derives from New Jersey courts' construction of contracts of adhesion. Contracts of adhesion are not bargained-for in the traditional sense; rather they are "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Rudbart v. Water Supply Comm'n,* 127 N.J. 344, 353, 605 A.2d 681, 685 (1992); *see also Black's Law Dictionary* 40 (6th ed. 1990). There is no middle ground and no room to negotiate terms. Where contracts of adhesion are deemed unconscionable or otherwise against public policy, courts have refused to enforce them. *See, e.g., Rudbart,* 127 N.J. at 353–56, 605 A.2d at 686–87. However, where, as here, there is nothing inherently unfair in the terms of a contract of adhesion, *see Gilmer,* 500 U.S. at 29–33, 111 S.Ct. at 1653–56 (finding employment arbitration clauses not inherently unfair), New Jersey courts have applied a special rule of construction.

In interpreting contracts like plaintiff's, where bargaining power is disparate and contracts are ones of adhesion, New Jersey courts have construed contract terms according to the reasonable expectations of the adhering party. *See Doto,* 140 N.J. at 555–57, 659 A.2d at 1376–77; *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 305–06, 208 A.2d 638, 644–45 (1965); *see also Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 F.2d 599, 601–02 (2d Cir.) (L. Hand, J.), *cert. denied,* 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947). These courts, construing insurance policies, reason:

> [W]hile insurance policies are contractual in nature, they are not ordinary contracts but contracts of adhesion between parties who are not equally situated. Even the most astute insured might find his or her bargaining power is necessarily limited. Insurance policies are often unilaterally prepared by the company's experts, persons learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium. Moreover, insurance contracts are not typically read or reviewed by the insured, whose understanding is often impeded by the complex terminology used in the standardized forms.

*Doto,* 140 N.J. at 555–56, 659 A.2d at 1376 (citations and internal quotation marks omitted).

Although the courts invoking this principle are usually interpreting insurance policies, their reasoning applies with equal force to the case at bar. Plaintiff, like most insureds, was in no position to dicker over unfavorable terms: if he wanted to be a KFC fry cook, plaintiff had to sign the arbitration agreement buried in KFC's employment application. *See* Plaintiff's Ex. B ("The *Agreement* section of the application must be read and signed in order for you to be considered for employment with KFC."). Moreover, a gross disparity in bargaining power existed between plaintiff and KFC. At the time he signed the employment application, plaintiff had an eleventh-grade education and a crimi-

nal record, was on parole and in dire need of a job. *See id.;* Caldwell Aff. ¶¶ 4–5. By contrast, KFC had unlimited access to lawyers well versed in the civil rights laws, contract formation, and the principles of clear draftsmanship. Only a minimum of thought would have been required to draft a clause which was as inclusive as desired by KFC while still making clear to an applicant for a fry cook's job that statutory civil rights claims would be subject to arbitration. *See, e.g., Johnson,* 940 F.Supp. at 1449 (quoting an arbitration clause specifically mentioning Title VII, the ADEA, the ADA, and state analogs).

█ Notwithstanding a general federal preference favoring arbitration, where an arbitration clause is prepared by an employer on a take-it or leave-it basis for signature by semi-skilled job applicants, a court will read the parties' agreement to carry out plaintiff's reasonable expectations in signing it. *See PaineWebber,* 921 F.2d at 513 (considering the will of the parties paramount in interpreting arbitration clauses). This places the burden of drafting an understandable arbitration clause in a manner consistent with well-established contract law—on the party who is doing the drafting and on the party with the vastly superior bargaining power. To be sure, where circumstances surrounding an agreement suggest that both parties knowingly agreed to arbitrate a particular dispute, a court ought to compel arbitration and carry out their wishes. However, nothing in the FAA prescribes a wooden application of the federal presumption in favor of arbitrability to the complete exclusion of well-established principles of contract construction. Even the *Gilmer* Court recognized that a "claim of unequal bargaining power is best left for resolution in specific cases." *Gilmer,* 500 U.S. at 33, 111 S.Ct. at 1656. Thus, this Court holds that plaintiff would not have reasonably understood that in signing the KFC employment application he was agreeing to arbitrate a future statutory civil rights claim for retaliatory termination. Accordingly, the Court will deny defendants' motion to compel arbitration.[7]

## V. CONCLUSION

For the reasons set forth above, the Court will deny plaintiff's application to amend his complaint to add a claim under the New Jersey Constitution, permit plaintiff to amend his complaint to correct KFC's corporate name and to reflect that plaintiff has now received an EEOC right to sue letter, grant in part and deny in part defendants' motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted, and deny defendants' motion in the alternative to compel binding arbitration of plaintiff's remaining claims. An appropriate order will issue on even date herewith.

---

**7.** This Court so holds in full recognition of other cases precluding employees from instituting civil rights claims suits against their employers by virtue of an arbitration clause. *See e.g., Gilmer,* 500 U.S. at 23–24, 111 S.Ct. at 1650–51; *Thomas James Assocs., Inc. v. Jameson,* 102 F.3d 60, 62 (2d Cir.1996); *Willis,* 948 F.2d at 306. These cases are easily distinguishable on their facts. For the most part, these cases involve well-educated stock analysts, brokers, traders, and executives as opposed to applicants for unskilled or semi-skilled job positions. *See, e.g., Gilmer,* 500 U.S. at 23, 111 S.Ct. at 1650–51 (manager of financial services); *Thomas James,* 102 F.3d at 62 (stock broker); *Willis,* 948 F.2d at 306 (account executive). As a result, the disparity in economic and legal bargaining power is not nearly as great as in the instant case. Further,

the arbitration clauses at issue in these cases tend to be more thorough and clearer than the one at issue here. *See Thomas James,* 102 F.3d at 62 (setting forth the NASD arbitration clause); *Willis,* 948 F.2d at 306 (setting forth the NYSE arbitration clause). Accordingly, the plaintiffs' reasonable expectations in agreeing to arbitrate closer approximate their employers' expectations in same. *See Willis,* 948 F.2d at 306 (discussing the U–4 form used by the three main stock exchanges). Lastly, the arbitration clauses in these cases are imposed not by the plaintiffs' employers but rather by the exchanges with whom their employers associate. *See id.* For these reasons, the Court considers these decisions, much like this one, inextricably tied to their facts and not necessarily controlling in later, similar cases.